889 F.2d 258
 SANDIA OIL COMPANY, INC., a New Mexico Corporation; Sunwest
Bank of Albuquerque, N.A., Plaintiffs-Appellees,
v.
Julius BECKTON, Director of the Federal Emergency Management
Agency, Defendant-Appellant.
 No. 86-2387.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 14, 1989.
 
 Richard K. Willard and John R. Bolton, Asst. Attys. Gen., Civ. Div., Dept. of Justice, Washington, D.C., William L. Lutz, U.S. Atty., Albuquerque, N.M., and Michael Jay Singer, W. Neil Hammerstrom, Jr., and Constance A. Wynn, Attorneys, Civ. Div., Dept. of Justice, Washington, D.C., for defendant-appellant.
 Michael Allison of Franchini, Henderson, Wagner & Oliver, Albuquerque, N.M., for plaintiffs-appellees.
 Before McKAY, SEYMOUR, and HIGGINBOTHAM,* Circuit Judges.
 PER CURIAM.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The cause is therefore ordered submitted without oral argument.
 
 
 2
 * Plaintiffs commenced this action pursuant to 42 U.S.C. Sec. 4072 for recovery under a Standard Flood Insurance Policy (the Policy) for flood damage to a concrete surface. The Policy was issued pursuant to the National Flood Insurance Program, which is administered by the Federal Emergency Management Agency (FEMA). The district court granted summary judgment for plaintiffs, awarding recovery under the Policy.
 
 
 3
 The material facts relative to this case are undisputed and were the subject of a stipulation by the parties. Plaintiff Sandia Oil Company, Inc. (Sandia) owns a gas station, partly insured by the Policy. Sandia's gas station consists of a large concrete foundation which is completely covered by a canopy. The canopy is supported by pillars sunk into a concrete foundation. In addition to covering its concrete foundation, the canopy also covers gasoline pumps and a pay booth. The pay booth has four walls and a roof and constitutes a building as defined in the Policy. The distance between the top of the pay booth and the bottom of the canopy is approximately five feet. The pay booth is not directly attached to the canopy covering.
 
 
 4
 On June 16 and 17, 1984, a flood, as defined in the Policy, caused damage to the concrete foundation underlying the canopy. Defendant denied liability for the damage, maintaining that only the pay booth was covered by the Policy.
 
 
 5
 After defendant denied coverage, plaintiffs commenced this action in the district court. In permitting plaintiffs to recover under the Policy, the district court determined that the damaged structure was an extension of or addition to the pay booth and, therefore, covered under the Policy. The district court relied on the following provision in the Policy: "Building: When the insurance under this policy covers a building, such insurance shall include additions and extensions attached thereto [and] permanent fixtures ... forming a part of and pertaining to the services of the building." The district court was aware, however, that the Policy did not cover "those portions of walks, driveways and other paved or poured surfaces outside the formulative walls of the building." Id. The district court entered judgment for plaintiffs in the amount of $11,053.80, plus postjudgment interest and costs.
 
 
 6
 On appeal defendant first contends that the district court erred in determining that the damage to the concrete foundation of Sandia's canopy is covered by the Policy. Specifically, defendant contends that because coverage under the Policy extends only to Sandia's building, defined as the "walled and roofed structure," the Policy would cover damage only to Sandia's pay booth and not to the concrete area underlying the canopy. The parties stipulated that the damaged concrete area was not a part of the foundation of the pay booth.
 
 
 7
 The pertinent coverage provisions of the Policy are ambiguous as applied to the facts and circumstances of this case, in view of Sandia's unique facilities and operation. "Where an insurance policy contains ambiguous or equivocal language, [the policy] should be interpreted favorably to the insured." Young v. Fidelity Union Life Insurance Co., 597 F.2d 705, 707 (10th Cir.1979) (citing Unigard Insurance Co. v. Studer, 536 F.2d 1337, 1339 (10th Cir.1976)); accord Atlas Pallet, Inc. v. Gallagher, 725 F.2d 131, 136 (1st Cir.1984) ("insurance contracts are construed liberally in the insured's interest and strictly against the insurer"). "[E]xceptions from coverage are to be strictly construed against the insurer when their application is doubtful." Webb v. Allstate Life Insurance Co., 536 F.2d 336, 340 (10th Cir.1976) (citing Equitable Fire & Marine Insurance Co. v. Allied Steel Construction Co., 421 F.2d 512, 513 (10th Cir.1970)). "Whether a particular structure is covered under the 'additions and extensions' clause of a policy of insurance 'depends upon the language of the policy as applied to the actual situation and use of the property.' " Atlas Pallet, 725 F.2d at 136 (quoting 1 Anderson, Couch on Insurance 2d Sec. 6:17, at 251 (1959) (emphasis added)).
 
 
 8
 With these principles in mind, we are persuaded that the district court correctly interpreted the Policy in this case. It is clear from the stipulated facts that the canopy and its concrete foundation and the pay booth comprise one whole functionally integrated unit, operation, and structure. We are further convinced that there is a definite and necessary connection, as contemplated by the parties to the Policy, between the canopy and its concrete foundation and the use and purposes of the pay booth, allowing the canopy and its concrete foundation to be considered an integral part, addition, or extension of the pay booth or as a permanent fixture forming a part of and pertaining to the services of the pay booth. Accord id. ("question thus turns on the relative location of the structures, their accessibility, and adaptability to some common end"). Consequently, like the district court, we interpret the Policy as covering the damage to the concrete foundation underlying the canopy.
 
 
 9
 Defendant has raised a point on appeal concerning the district court's reference throughout its opinion to the damage sustained by plaintiffs. Specifically, defendant argues that the district court mistakenly believed that the canopy itself, rather than its concrete foundation, was damaged by the flood. We disagree with defendant. The district court's opinion demonstrates a precise understanding of the nature of Sandia's premises and the circumstances surrounding the flood and the resulting damage. It appears that the district court referred to the damage to the concrete foundation as damage to the canopy because it viewed the canopy and foundation as a structurally integrated unit.[1] Indeed, the district court granted summary judgment on the basis of stipulated facts which make it clear that the only damage to Sandia's premises resulting in plaintiffs' claim was the damage to the concrete foundation of the canopy. Consequently, there was no dispute as to what was damaged; and that fact was clear when the district court had before it the independent claims adjuster's recommendation that plaintiffs be paid $11,053.80. The adjuster's report makes it clear that that amount covered the damage to the concrete foundation underlying the canopy. The district court awarded plaintiffs $11,053.80, the exact amount recommended by the adjuster and requested by the plaintiffs for the damage to the concrete foundation.
 
 
 10
 We affirm the district court's determination of defendant's liability.
 
 II
 
 11
 Defendant next argues that the district court erred in awarding post-judgment interest. At our request, the parties have briefed the effect of the recent Supreme Court case Loeffler v. Frank, 486 U.S. 549, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988), on the waiver of sovereign immunity for awards of post-judgment interest against FEMA.
 
 
 12
 Under the traditional "no-interest" rule, the United States is generally immune from awards of interest on claims against it. Library of Congress v. Shaw, 478 U.S. 310, 106 S.Ct. 2957, 2963, 92 L.Ed.2d 250 (1986). Nevertheless, the no-interest rule is inapplicable 1) in a takings case where interest is constitutionally required, 2) where interest awards are specifically provided for in statute or contract or otherwise expressly consented to, and 3) "where the Government has cast off the cloak of sovereignty and assumed the status of a private commercial enterprise." Id. 106 S.Ct. at 2963 & n. 5. The first exception has no application in this case.
 
 
 13
 Plaintiffs argue that Congress expressly consented to awards of interest against FEMA by allowing suits against the agency under 42 U.S.C. Sec. 4072. Purported waivers of sovereign immunity are strictly construed, especially when dealing with interest awards:
 
 
 14
 In analyzing whether Congress has waived the immunity of the United States, we must construe waivers strictly in favor of the sovereign, see McMahon v. United States, 342 U.S. 25, 27, 72 S.Ct. 17, 19, 96 L.Ed. 26 (1951), and not enlarge the waiver " 'beyond what the language requires,' " Ruckelshaus v. Sierra Club, 463 U.S. 680, 685-686, 103 S.Ct. 3274, 3278, 77 L.Ed.2d 938 (1983), quoting Eastern Transportation Co. v. United States, 272 U.S. 675, 686, 47 S.Ct. 289, 291, 71 L.Ed. 472 (1927). The no-interest rule provides an added gloss of strictness upon these usual rules.
 
 
 15
 "[T]here can be no consent by implication or by use of ambiguous language. Nor can an intent on the part of the framers of a statute or contract to permit the recovery of interest suffice where the intent is not translated into affirmative statutory or contractual terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed." United States v. N.Y. Rayon Importing Co., 329 U.S. at 659, 67 S.Ct. at 604 [91 L.Ed. 577 1947].
 
 
 16
 Library of Congress v. Shaw, 106 S.Ct. at 2963. In Shaw, the Supreme Court strictly construed Sec. 706(k) of Title VII, which makes the United States "liable for costs the same as a private person" in employment discrimination suits, to deny an award of interest against the Library of Congress. Id. at 2966. By no stretch of the language in Sec. 4072 can it be construed as expressly consenting to interest awards against FEMA. See In re Estate of Lee, 812 F.2d 253, 256 (5th Cir.1987).
 
 
 17
 We therefore turn to the third exception to the no-interest rule and consider whether the government has cast off the cloak of sovereign immunity by giving FEMA's flood insurance program the status of a commercial enterprise. This exception to the no-interest rule was the focus of the Court's opinion in Loeffler:
 
 
 18
 Congress, however, has waived the sovereign immunity of certain federal entities from the times of their inception by including in the enabling legislation provisions that they may sue and be sued. In FHA v. Burr, 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940), the Court explained:
 
 
 19
 "[S]uch waivers by Congress of governmental immunity ... should be liberally construed.... Hence, when Congress establishes such an agency, authorizes it to engage in commercial and business transactions with the public, and permits it to 'sue and be sued,' it cannot be lightly assumed that restrictions on that authority are to be implied."
 
 
 20
 Loeffler, 108 S.Ct. at 1969. Based on the Postal Service's status as a commercial entity and the existence of a sue-and-be-sued clause in its organic statute, the Court determined in Loeffler that interest was recoverable against the Postal Service to the same extent as against a private party. Id. at 1970.
 
 
 21
 Unlike the Postal Service at issue in Loeffler, FEMA does not have a statutory provision allowing the agency to sue and be sued generally in relation to the flood insurance program. Section 4072 limits a claimant's ability to sue on a flood insurance policy. Insurance claims must initially be submitted to the Director of FEMA. After total or partial disallowance of a claim, the claimant has one year to file an action. Exclusive original jurisdiction of such suits lies in the federal district courts. 42 U.S.C. Sec. 4072; Spielman v. FEMA, 609 F.Supp. 111, 112 (D.Minn.1985); Possessky v. National Flood Insurers Ass'n, 507 F.Supp. 913, 915 (D.N.J.1981). Section 4072's waiver of immunity has been strictly construed not to allow a jury trial against the government. Yonker v. Guifrida, 581 F.Supp. 1243, 1245-46 (D.W.Va.1984); Latz v. Gallagher, 562 F.Supp. 690, 693 (W.D.Mich.1983); Kolner v. Director, FEMA, 547 F.Supp. 828, 829-30 (N.D.Ill.1982). While Sec. 4072 limits suits against FEMA, it has no provision at all for suits by the agency.
 
 
 22
 Nevertheless, absence of a general sue-and-be-sued clause is not necessarily fatal to appellees' claim that FEMA's flood insurance program is a commercial enterprise. The Loeffler court noted that "authorization of suits against federal entities engaged in commercial activities may amount to a waiver of sovereign immunity from awards of interest when such awards are an incident of suit." 108 S.Ct. at 1969 (emphasis added). The Court cited Standard Oil Co. v. United States, 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519 (1925), in which interest was allowed on an insurance claim against the Bureau of War Risk Insurance. The Bureau had no general sue-and-be-sued clause, but Congress had provided for suits on insurance claims. In Standard Oil, the Court concluded: "When the United States went into the insurance business, issued policies in familiar form and provided that in case of disagreement it might be sued, it must be assumed to have accepted the ordinary incidents of suits in such business." 267 U.S. at 79, 45 S.Ct. at 212.
 
 
 23
 The Standard Oil case was distinguished in United States v. Worley, 281 U.S. 339, 50 S.Ct. 291, 74 L.Ed. 887 (1930), dealing with an insurance program designed to provide death or disability coverage to members of the armed services. In contrast to the Standard Oil insurance program, which was intended to be self-sufficient and in fact resulted in a large profit to the government, the premiums paid in Worley were inadequate. "The Congress intended that the United States should bear, and undoubtedly it [did bear], a large part of the cost." Worley, 281 U.S. at 343, 50 S.Ct. at 293. Worley suggests that unless a governmental entity engages in business-type activity with a business-minded purpose, it will not be treated as engaging in commercial activities.
 
 
 24
 In our view, FEMA's flood insurance program is not a commercial venture, but rather constitutes the subsidized variety of insurance program within the ambit of Worley. The legislative history of the statute reveals Congress's intent to underwrite the insurance coverage:
 
 
 25
 Any Federal "subsidy" which will accrue under the insurance program to the benefit of property owners now occupying the flood plain is defensible only as part of an interim solution to long-range readjustments in land use. Because such assistance should not prejudice these needed long-range adjustments, the case for temporary partial subsidization of the cost of flood premiums for existing properties in high-hazard zones is not at all valid for new properties in the same zones.
 
 
 26
 1968 U.S.Code Cong. & Admin.News 2873, 2969. It is true that Congress envisioned the program as eventually becoming self-sufficient. From the existing statutory structure and the available evidence, however, it appears that this goal has not been realized.
 
 
 27
 FEMA is instructed to estimate the premiums required to make flood insurance available on an actuarial basis. 42 U.S.C. Sec. 4014(a)(1). However, it must also estimate reasonable rates which would encourage prospective insureds to purchase flood insurance and which would be consistent with the purposes of the flood insurance program, even if those rates fall below actuarial rates. 42 U.S.C. Sec. 4014(a)(2). FEMA prescribes by regulation the actual rates to be charged, and has specific authority "where necessary" to charge less than the actuarial rates calculated under Sec. 4014(a)(1). 42 U.S.C. Sec. 4015(a)(1). In calculating premiums, FEMA is directed to disregard certain risks to properties in parts of Louisiana, and in areas which have partially completed flood protection systems. 42 U.S.C. Sec. 4014(d), (e).
 
 
 28
 When flood insurance was being provided through private insurers under Part A of the National Flood Insurance Program, the federal government made "premium equalization payments" into an industry flood insurance pool to compensate for premiums set at less than an actuarial rate. 42 U.S.C. Sec. 4054. It also provided for "reinsurance" covering losses in excess of the risk assumed by the industry pool. 42 U.S.C. Sec. 4055. Now that FEMA has switched to a Part B flood insurance program operated by the government, the ultimate risk bearer for all expenses of the program is the National Flood Insurance Fund. 42 U.S.C. Sec. 4017(d). The Director of FEMA has authority to borrow up to $500,000,000 from the United States Treasury (or $1,000,000,000 with the President's approval) for deposit in the Fund. 42 U.S.C. Sec. 4016. Congress periodically appropriates money to repay the loans. Since 1980, Congress appears to have appropriated substantial amounts for that purpose. Pub.L. 96-526, 94 Stat. 3044, 3053 (1980) ($575,000,000); Pub.L. 97-101, 95 Stat. 1417, 1425 (1981) ($373,000,000); Pub.L. 97-272, 96 Stat. 1160, 1169 (1982) ($39,159,000); Pub.L. 98-45, 97 Stat. 219, 228 (1983) ($37,521,000); Pub.L. 98-371, 98 Stat. 1213, 1224 (1984) ($200,205,000); Pub.L. 99-160, 99 Stat. 909, 918 (1985) ($92,852,000).
 
 
 29
 If Congress intended FEMA's flood insurance program to be a "commercial enterprise," it certainly made a poor investment. Indeed, the program was set up originally because it was "uneconomic for the private insurance industry alone to make flood insurance available to those in need of such protection on reasonable terms and conditions." 42 U.S.C. Sec. 4001(b)(1). It is unlikely that Congress intended to accomplish what the private insurance industry could not without any burden on the public fisc. The flood insurance program was intended from the beginning to be, not a commercial enterprise, but rather a subsidized insurance program of the sort in Worley, designed to accomplish important national goals at some cost to the national treasury. Thus, because we find no evidence that FEMA has been thrust into the commercial world, and no explicit waiver of sovereign immunity, we reverse the award of post-judgment interest entered against FEMA in this case.
 
 
 30
 AFFIRMED in part, REVERSED in part.
 
 
 
 *
 Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit Court of Appeals, sitting by designation
 
 
 [1]
 If the district court's use of the word "canopy" did not encompass the concrete foundation underlying the canopy itself, we believe that the district court simply misspoke when it referred to plaintiffs' damage as "damage to the canopy." We are convinced that the district court understood and was not confused about what was actually damaged in this case, in view of the fact that damage to the concrete foundation of the canopy was not even disputed by the parties