Irene FLICK, Plaintiff–Appellant,

v.

**LIBERTY MUTUAL FIRE
INSURANCE COMPANY,**
Defendant–Appellee.

No. 98–16485.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1999

Filed Feb. 15, 2000

Company ("Liberty Mutual"). Flick filed a civil complaint seeking damages resulting from Liberty Mutual's denial of a claim under a standard flood insurance policy that was underwritten by Liberty Mutual as part of the National Flood Insurance Program. The district court granted summary judgment in favor of Liberty Mutual on the basis that Flick had failed to comply strictly with the policy's 60 day sworn proof of loss requirement. Flick contends that the district court erred in applying the rule of strict compliance to the policy's sworn proof of loss requirement. We affirm. We conclude that the strict compliance rule is applicable to policies written by private insurance companies under the National Flood Insurance Program, because those insurers draw funds from the United States Treasury ("Treasury") to pay flood loss claims.

Ron Leaf, Law Offices of Ron Leaf, San Mateo, California, for the plaintiff-appellant.

Heidi Loken Benas and James Sell, Lynch, Gilardi & Grummer, San Francisco, California, for the defendant-appellee.

Before: GOODWIN, SCHROEDER, and ALARCON, Circuit Judges.

Opinion by Judge ALARCON; Dissent by Judge SCHROEDER.

ALARCON, Circuit Judge:

Irene Flick ("Flick") appeals from the order granting summary judgment in favor of the Liberty Mutual Fire Insurance

I

Congress enacted the National Flood Insurance Act of 1968 in response to a growing concern that the private insurance industry was unable to offer reasonably priced flood insurance on a national basis. *See* 42 U.S.C. § 4001(a), (b); *Van Holt v. Liberty Mut. Fire Ins. Co.*, 163 F.3d 161, 165 & n. 2 (3d Cir.1998). A report by the Secretary of the Department of Housing and Urban Development ("HUD") had indicated that it was not feasible for the private insurance industry, acting alone, to provide flood insurance at a reasonable price.[1] *See* Staff of Senate Comm. on Banking and Currency, 89th Cong., 2d Sess., *Insurance and Other Programs for Financial Assistance to Flood Victims* 98–99 (Comm. Print 1966) (report from Robert C. Weaver, Secretary of HUD). The

---

**1.** The Southeast Hurricane Disaster Relief Act of 1965 directed the Secretary of HUD to undertake a study and prepare a report on the various programs which might be established to help provide financial assistance to those suffering property losses in flood and other natural disasters. Publ. L. No. 89–339, § 5. The HUD report, which was submitted to Congress in 1966, provided the basis for the

enactment of the National Flood Insurance Act. *See* Edward T. Pasterick, *The National Flood Insurance Program, in Paying the Price: The Status and Role of Insurance Against Natural Disasters in the United States* 125, 127 (Howard Kunreuther & Richard J. Roth, Sr. eds., 1998). Subsequent revisions of that legislation have also been based on the HUD report's suggestions. *See id.*

HUD report found that private insurers traditionally had refused to write flood policies in the belief that they lacked an adequate actuarial basis for providing coverage and that the public was not interested in purchasing flood insurance. *See id.* The report also found that, even if the private insurance industry were to have offered flood insurance on a sound actuarial basis, inhabitants of flood prone areas would have rejected unsubsidized coverage as too costly or too uneconomical.[2] *See id.*

The National Flood Insurance Act, therefore, authorizes the federal government to establish the National Flood Insurance Program ("NFIP"), a program with "large-scale" federal involvement, to provide affordable flood insurance on a national basis and to discourage the construction of new structures in flood prone areas. *See* 42 U.S.C. §§ 4001(b), 4011(a); 1968 U.S.Code Cong. & Admin. News 2873, 2966–67, 2969. To accomplish those goals, the act authorizes the federal government to offer flood insurance at below actuarial rates for high risk structures erected before the preparation of a community's flood insurance rate map. *See* 42 U.S.C. § 4015(a)-(c); 1968 U.S.Code Cong. & Admin. News at 2969. The act does not, however, authorize the NFIP to provide a similar subsidy to owners of structures that are built after a community's actuarial rates are set. *See* 42 U.S.C. § 4015(c); 1968 U.S.Code Cong. & Admin. News at 2969.

The National Flood Insurance Act outlines two alternative frameworks for implementing the NFIP. *See generally National Flood Insurers Ass'n v. Harris,* 444 F.Supp. 969, 970–72 (D.D.C.1977) (discussing the two authorized methods for implementing the NFIP). Part A allows an associated pool of private insurance com-

panies to implement a privately operated program. *See* 42 U.S.C. §§ 4051, 4052. Part B authorizes the federal government to implement an alternative program through the "facilities of the federal government." 42 U.S.C. § 4071.

Initially, the NFIP was implemented under Part A and administered by an associated pool of private insurance companies pursuant to an annual contract with HUD. *See* 42 U.S.C. §§ 4051, 4052; *National Flood Insurers Ass'n,* 444 F.Supp. at 970–71 (discussing the implementation of the NFIP under Part A). The associated pool provided the risk capital, issued flood insurance policies, and paid all claims for flood losses. *See Sandia Oil Co. v. Beckton,* 889 F.2d 258, 263 (10th Cir.1989); *Kolner v. Director, Fed. Emergency Management Agency,* 547 F.Supp. 828, 829 (N.D.Ill.1982). The federal government made "premium equalization payments" to the associated pool to compensate for premiums that were set below actuarial rates. *See* 42 U.S.C. § 4054; *Sandia Oil Co.,* 889 F.2d at 263. It also provided reinsurance to cover flood losses that exceeded the insurance risk assumed by the industry pool. *See* 42 U.S.C. § 4055; *Sandia Oil Co.,* 889 F.2d at 263.

In 1977, HUD decided to discontinue the private operation of the NFIP under Part A. It communicated its intent to Congress to provide flood insurance through the "facilities of the federal government" pursuant to Part B of the National Flood Insurance Act. *See* 42 U.S.C. § 4071; 42 Fed. Reg. 58569 (1979) (giving Congress notice of the transition to a Part B program); *Kolner,* 547 F.Supp. at 829–30. On January 1, 1978, HUD assumed full control of the program with the intention of retaining, to the extent practicable, the services of private insurers as "fiscal agents" of the

---

**2.** Inhabitants of flood prone areas must pay exorbitant actuarial rates for flood insurance, because they are the most likely to make claims for flood losses. In locations where the risk of flooding is high, it can be economically more rational to abandon existing structures than to purchase flood insurance at the full actuarial rate. *See* Staff of Senate Comm. on Banking and Currency, 89th Cong., 2d Sess., *Insurance and Other Programs for Financial Assistance to Flood Victims* 98–99 (Comm. Print 1966) (report from Robert C. Weaver, Secretary of the Department of Housing and Urban Development).

United States. *See* 42 U.S.C. § 4071; 42 Fed.Reg. 58573 (1977); *Kolner*, 547 F.Supp. at 829. At that time, all flood insurance policies were deemed issued by the Federal Insurance Administration. *See Kolner*, 547 F.Supp. at 829.

In 1978, HUD delegated to the Federal Emergency Management Agency ("FEMA") its authority to operate both the NFIP and the Federal Insurance Administration.[3] *See* Reorganization Plan No. 3 of 1978, §§ 202, 304, 43 Fed.Reg. 41943, 41943–45 (1978). FEMA assumed managerial responsibility for the operation of the program and took full control of the payment or disallowance of all flood insurance claims. *See Berger v. Pierce*, 933 F.2d 393, 395 (6th Cir.1991). It then established the National Flood Insurance Fund in the Treasury of the United States to pay claims and administrative expenses. *See* 42 U.S.C. § 4017(a), (d); *Sandia Oil Co.*, 889 F.2d at 263.

In 1983, FEMA exercised its regulatory authority under 42 U.S.C. § 4081(a) and created the "Write Your Own" ("WYO") program to assist it in marketing flood insurance through the "facilities of the federal government." *See* 42 U.S.C. §§ 4081(a), 4071; 44 C.F.R. § 62.23–24; 48 Fed.Reg. 46789 (1983) (amending the federal regulations to establish the WYO program); *Van Holt*, 163 F.3d at 165. The WYO program allows private insurers to write standard flood insurance policies under their own names. *See* 44 C.F.R. § 62.23. Coverage is provided under the auspices of the NFIP, pursuant to the program's regulations, and is identical in scope and in cost to policies issued directly by FEMA. *See* 48 Fed.Reg. 46789 (1983). Under the NFIP regulations, a claimant under a standard flood insurance policy must submit a sworn proof of loss within 60 days of any flood loss. *See* 44 C.F.R. pt. 61, app. A(1), art. 9(J)(3).

**II**

Liberty Mutual insured Flick for flood loss under an insurance policy that it issued as part of the WYO program. The Liberty Mutual policy, which was written as a standard flood insurance policy, required Flick to submit a sworn proof of flood loss within 60 days of any flood loss. On December 11, 1995, flooding caused the foundation of Flick's house to subside. Flick notified Liberty Mutual of her flood loss on February 6, 1996. She did not, however, submit a sworn proof of loss at that time. Liberty Mutual denied the claim on April 8, 1996, because, among other reasons, Flick had failed to file a sworn proof of loss within 60 days. Flick finally submitted a sworn proof of loss on September 17, 1996, approximately nine months after the flood loss had occurred.

Flick then commenced this lawsuit in district court, asserting state law causes of action for breach of contract and breach of the covenant of good faith and fair dealing. Both parties stipulated that the National Flood Insurance Act preempted those claims. Liberty Mutual moved to bifurcate the trial and to try the issue of whether Flick had failed to submit a sworn proof of loss within 60 days of the flood loss. Flick agreed that the sworn proof of loss issue should be summarily adjudicated before trial. In a pretrial conference, the district court granted summary judgment in favor of Liberty Mutual, because Flick had failed to file a sworn proof of loss within 60 days of her flood loss.

**III**

In this appeal, Flick contends that the district court erred in granting summary judgment. She argues that the rule of strict compliance, which is applicable to policies issued by the federal government that provide for payment of losses from public funds, is inapplicable to the sworn

---

**3.** Congress amended the National Flood Insurance Act in 1983 to substitute the Director of FEMA for the Secretary of HUD. *See* Act of Nov. 30, 1983, Pub.L. No. 98–181, § 451(d), 97 Stat. 1153; 1983 U.S.Code. Cong. & Admin. News 1153, 1229.

**390**

proof of loss requirement in insurance policies issued under the NFIP. To support that proposition, she asserts that flood insurance losses under the NFIP have been, and will continue to be, paid entirely out of a surplus of retained flood insurance premiums. Flick suggests that we (1) adopt a rule of substantial compliance or notice prejudice to govern the sworn proof of loss requirement in the standard flood insurance policy or, in the alternative, (2) find an exception to the rule of strict compliance for flood induced subsidence cases.

▆▆ We have jurisdiction pursuant to 42 U.S.C. § 1291.[4] We review de novo a grant of summary judgment. *See Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir.1999) (en banc). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See id.*

▆▆ "The law is clear that, as contracts, [standard flood insurance policies] issued under the National Flood Insurance Program ... are governed by federal law applying standard insurance law principles." *McHugh v. United Serv. Auto. Assoc.*, 164 F.3d 451, 454 (9th Cir.1999) (citing *Brazil v. Giuffrida*, 763 F.2d 1072, 1074–75 (9th Cir.1985)). There is a compelling interest in assuring uniformity of decision in cases involving the NFIP. *See Brazil*, 763 F.2d at 1075 (quoting *West v. Harris*, 573 F.2d 873, 881 (5th Cir.1978)). "Since the flood insurance program is a child of Congress, conceived to achieve policies which are national in scope, and

since the federal government participates extensively in the program both in a supervisory capacity and financially, it is clear that the interest in uniformity of decision present in this case mandates the application of federal law." *Id.*

Federal law has long recognized that an insured must comply strictly with the terms and conditions of a federal insurance policy. *See Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947). In *Merrill*, the Supreme Court recognized a general "duty of all courts to observe the conditions defined by Congress for charging the public treasury." *Id.* at 385, 68 S.Ct. 1. The Court held that a group of farmers could not recover for crop losses under a federal crop insurance policy, because their claims did not comply with the terms and conditions for coverage set forth in the Wheat Regulations.[5] *See id.* In so holding, the Court noted that "not even the temptations of a hard case" may provide a basis for a recovery that is contrary to federal regulations. *Id.* at 386, 68 S.Ct. 1.

In the context of flood insurance, we have recognized the heavy burden that a claimant must overcome in order to avoid the sworn proof of loss requirement in the standard flood insurance policy. *See Wagner v. Director, Fed. Emergency Management Agency*, 847 F.2d 515, 518–19 (9th Cir.1988). In *Wagner*, we held that a group of claimants could not estop FEMA from denying their claims for failure to file a timely sworn proof of loss. *Id.* at 519–20. In reaching that decision, we reasoned that the sworn proof of loss requirement is

4. The district court had subject matter jurisdiction pursuant to 42 U.S.C. § 4072. *See* 42 U.S.C. § 4072 (conferring original exclusive jurisdiction over actions against FEMA); *Van Holt*, 163 F.3d at 167 (holding that 42 U.S.C. § 4072 also confers subject matter jurisdiction over actions against WYO insurers).

5. In *Merrill*, the Federal Crop Insurance Corporation promulgated regulations specifying the conditions under which it would insure wheat crops. One regulation made "spring wheat which has been reseeded on winter wheat acreage" ineligible for insurance. Without knowledge of that requirement, the farmers applied and were insured for a wheat crop that had been reseeded on winter wheat acreage. The Supreme Court held that the Federal Crop Insurance Corporation was not liable for the loss on the reseeded acreage, even if a private insurance company could have been held liable for the misrepresentations of its agent. *Id.* at 383–84, 68 S.Ct. 1.

a condition precedent to a waiver by the federal government of its sovereign immunity and, as such, a procedural requirement that must be taken seriously. *See id.* at 518. We then concluded that the claimants could not establish the more stringent requirement necessary to estop the federal government from insisting on strict compliance with the sworn proof of loss requirement. *See id.* at 519–20.

While our result in *Wagner* is sound, the Supreme Court has since recognized that our power to avoid the terms and conditions of a federal insurance policy is even more curtailed. In *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), the Court acknowledged that the Appropriations Clause prohibits the judiciary from granting any money claim against the federal government that is not authorized by statute. *Id.* at 424, 434, 110 S.Ct. 2465. That clause succinctly provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Its fundamental purpose is "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to ... the individual pleas of litigants." *Richmond,* 496 U.S. at 428, 110 S.Ct. 2465.

In *Richmond,* the Supreme Court considered whether a retired federal employee could prevent the federal government from enforcing a statutory earnings limit in a federal disability annuity. *See id.* at 415–16, 110 S.Ct. 2465. The employee had qualified for disability payments under the annuity, but after receiving erroneous advice from a federal official, had disqualified himself by exceeding the earnings limit. *See id.* at 417–18, 110 S.Ct. 2465. The employee sued the federal government to recover the unpaid disability benefits, alleging that it was estopped from applying the earnings limit. *See id.* at 415–16, 110 S.Ct. 2465. The Supreme Court held that the employee could not recover the unpaid

disability payments, because, in enacting the disability statute, Congress had appropriated funds to pay benefits to only those individuals who earned less than a specified amount. *See id.* at 424–27, 434, 110 S.Ct. 2465. In reaching that decision, the Court recognized that the Appropriations Clause prohibits the judiciary from awarding claims against the United States that are not authorized by statute. *See id.* at 424–26, 110 S.Ct. 2465. It then concluded that the "judicial use of the equitable doctrine of estoppel cannot grant [a claimant] a money remedy that Congress has not authorized." *Id.* at 426, 110 S.Ct. 2465.

■ Because the holding in *Richmond* was based on the Appropriations Clause, its scope is not limited to the applicability of estoppel to the federal government. *See Richmond,* 496 U.S. at 426, 110 S.Ct. 2465 (noting that the presidential power to pardon does not override the command of the Appropriations Clause) (citing *Knote v. United States,* 95 U.S. 149, 13 Ct.Cl. 517, 24 L.Ed. 442 (1877)). It is an axiomatic principle of constitutional law that the judiciary's power is limited by a valid reservation of congressional control over public funds. *See Richmond,* 496 U.S. at 425, 110 S.Ct. 2465. "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id.* Indeed, we would equally usurp Congress's exclusive power to appropriate money were we to award an unauthorized money claim based on a theory of substantial compliance or notice prejudice. We therefore interpret *Richmond* to preclude a court from granting a remedy that draws funds from the Treasury in a manner that is not authorized by Congress.

■ In light of that conclusion, it is clear that a claimant under a standard flood insurance policy may not avoid strict enforcement of the 60 day sworn proof of loss requirement, except through a valid waiver by the Federal Insurance Adminis-

trator. *See* 44 C.F.R. § 61.13(d); 44 C.F.R. pt. 61, app. A(1), art. 9(J)(7) (setting forth the conditions for waiver). FEMA currently operates the flood insurance program under Part B of the National Flood Insurance Act and pays claims out of the National Flood Insurance Fund, which is located in the Treasury. *See* 42 U.S.C. 4017(a), (d) (authorizing the creation of a flood insurance fund in the Treasury to disburse claims made under a federally operated program); *Sandia Oil Co. v. Beckton*, 889 F.2d 258, 263 (10th Cir. 1989) (stating that the National Flood Insurance Fund is the ultimate risk bearer under the Part B flood insurance program). The Director of FEMA has authority to borrow an additional $500 million from the Treasury to pay claims when the National Flood Insurance Fund has insufficient funds.[6] *See* 42 U.S.C. § 4016.

Under the NFIP regulations, WYO insurers also pay claims out of the National Flood Insurance Fund. The federal government is a guarantor and assumes full liability for flood insurance policies that are issued by WYO insurers. *See* 44 C.F.R. § 62.23(f); 64 Fed.Reg. 27705, 27708 (1999) (stating that WYO insurers "do not have to pay for reinsurance for their flood business since the Federal Government assumes the liability for flood losses"). WYO insurers must remit to the Federal Insurance Administration for deposit in the National Flood Insurance Fund all funds that are not necessary to meet their current expenditures. *See* 44 C.F.R. pt. 62, app. A, arts. II(E), VII(B). WYO insurers may later draw money from the National Flood Insurance Fund, through letters of credit issued by FEMA, to pay claims or expenses that exceed the funds retained to meet current expenditures. *See* 44 C.F.R. pt. 62, app. A, arts. II(E), IV(A), VII(A).

Flick contends that WYO insurers retain a sufficient amount of premiums in segregated accounts to pay flood losses as they occur.[7] We reject that assertion. The NFIP regulations plainly indicated that

**6.** Loans from the Treasury are repaid with special appropriations or with newly written flood insurance premiums. Prior to 1986, Congress regularly appropriated money to the National Flood Insurance Fund to repay additional loans from the Treasury. *See, e.g.,* Act of Dec. 15, 1980, Pub.L. No. 96–526, 94 Stat. 3044, 3053 (appropriating $575,000,000 to the fund); Act of Dec. 23, 1981, Pub.L. No. 97–101, 95 Stat. 1417, 1425 (appropriating $373,000,000 to the fund); Act of Sept. 30, 1982, Pub.L. No. 97–272, 96 Stat. 1160, 1169 (appropriating $39,159,000 to the fund); Act of July 12, 1983, Pub.L. No. 98–45, 97 Stat. 219, 228 (appropriating $37,521,000 to the fund); Act of July 18, 1984, Pub.L. No. 98–371, 98 Stat. 1213, 1224 (appropriating $200,205,000 to the fund); Act of Nov. 25, 1985, Pub.L. No. 99–160, 99 Stat. 909, 918 (appropriating $92,852,000 to the fund). Since then, FEMA has instituted a policy of repaying Treasury loans with revenues from written flood insurance premiums. *See generally* U.S. General Accounting Office, *Flood Insurance: Financial Resources May Not Be Sufficient to Meet Future Expected Losses,* Letter Report No. RCED–94–80, 3–3.3 (1994) (explaining the NFIP's goal of using revenues to pay losses and expenses). Written premiums, however, are not always sufficient to cover flood losses and also repay loans from the Treasury. According to FEMA, the NFIP owed the Treasury $541 million in unpaid loans as of August 31, 1999. *See National Flood Insurance Program: Before the House Subcomm. on Housing and Community Opportunity,* 106th Cong. ___ (1999) (statement of Stanley J. Czerwinski, Associate Director, United States General Accounting Office, Housing and Community Development Issues, Resources, Community, and Economic Development Division). That amount was expected to increase as the NFIP began to pay flood losses caused by the 1999 hurricane season. *See National Flood Insurance Program: Before the House Subcomm. on Housing and Community Opportunity,* 106th Cong. ___ (1999) (statement of James Lee Witt, Director, Federal Emergency Management Agency) (predicting that the current level of borrowing will approach $700 million as the NFIP continues to pay claims resulting from Hurricane Floyd).

**7.** Flick did not present any facts to the district court to suggest that WYO insurers do not draw funds from the National Flood Insurance Fund through letters of credit issued by FEMA. She attempts to cure that error in this appeal by requesting that we take judicial notice of historical statistics indicating that the NFIP's annual total premiums generally exceed its annual total losses.

WYO insurers may retain no more funds than are necessary to meet their current expenditures. *See* 44 C.F.R. pt. 62, app. A, arts. II(E), VII(B). The WYO Accounting Procedures Manual limits that amount to a cash reserve of $5,000 plus "established payables" and requires WYO insurers to transmit any excess funds to the Treasury on a weekly basis.[8] *See* National Flood Ins. Program, Fed. Emergency Management Agency, *WYO Accounting Procedures Manual* pts. B–5, C–2 (7th ed.1997); *see also Van Holt,* 163 F.3d at 165 (stating that current expenditures are limited to $5,000).

■■ We do not believe, nor has Flick provided any basis for us to believe, that

WYO insurers' retained funds are sufficient to cover claims for flood losses. Flood losses, when they occur, are typically sudden, widespread, and costly. A large percentage of those losses are insured under policies that have been issued at below actuarial rates.[9] It is doubtful, then, that WYO insurers can satisfy their obligations to pay flood losses entirely with the funds that they have retained to meet current expenditures. We thus join the Third and Fifth Circuits in concluding that WYO insurers typically deplete their net premium income and draw funds from the National Flood Insurance Fund to pay losses under standard flood insurance policies.[10] *See Van Holt,* 163 F.3d at 165

It is rarely appropriate for an appellate court to take judicial notice of facts that were not before the district court. *Yagman v. Republic Ins.,* 987 F.2d 622, 626 n. 3 (9th Cir. 1993); *Taylor AG Indus. v. Pure–Gro,* 54 F.3d 555, 558–59 (9th Cir.1995). We may, however, properly take judicial notice of facts outside of the record when creating new rules of law. *See* Fed.R.Evid. 201, note to subdiv. (a) (stating that a court may undertake an independent search for persuasive data). In this case, though, we deny such a request, because the historical statistics are not relevant to any issue on appeal. *See Ruiz v. City of Santa Maria,* 160 F.3d 543, 548 n. 13 (9th Cir.1998). Those figures do not explain how cash flows between the National Flood Insurance Fund, which is located in the Treasury, and WYO insurers. Nor may that flow of cash be deciphered from the entire program's historical year end statistics with a simple subtraction of the total losses paid from the total premiums earned.

8. The NFIP regulations require WYO insurers to comply with the accounting standards established by FEMA in the WYO Accounting Procedures Manual. *See* 44 C.F.R. pt. 62, app. A, art. II(E). The WYO Accounting Procedures Manual provides, in pertinent part:

Transfer of excess funds from the restricted flood insurance account to the U.S. Treasury is mandatory and should be performed at least once a week. Excess funds are defined as those funds in the restricted account less $5,000 and established payables. Monies in the premium suspense account are to be included in the excess funds calculation. In addition, premiums and federal policy fees collected for policies with future

effective dates should be included in the excess funds calculation. Established reserves for claim payments and claim loss adjustment expenses are not included when calculating the excess funds amount.

*Id.* at pt. C–2 (internal cross reference omitted). Funds retained in the restricted account are considered accounts payable due from the Federal Insurance Administration. *See id.* at pt. B–5. *See also, e.g.,* National Flood Ins. Program, Fed. Emergency Management Agency, *WYO Accounting Training Manual* pts. B–52, B–53 (6th ed.1996) (providing an example of the method in which cash flows between WYO insurers and the National Flood Insurance Fund).

9. Structures insured at below actuarial rates are not built to NFIP standards and, accordingly, suffer on average five times more damage than structures insured at actuarial rates. In fiscal year 1993, those structures accounted for 41% of all policies in force under the NFIP. In fiscal year 1998, those structures accounted for 30% of all policies in force. *See National Flood Insurance Program: Before the House Subcomm. on Housing and Community Opportunity,* 106th Cong. ___ (1999) (statement of Stanley J. Czerwinski, Associate Director, United States General Accounting Office, Housing and Community Development Issues, Resources, Community, and Economic Development Division).

10. We respectfully disagree with the dissent's attempt to analogize this case to the Third Circuit's decision in *Lovell Mfg. v. Export–Import Bank,* 777 F.2d 894 (3d Cir.1985). *Id.* (holding that a claim against a private insurer who purchased reinsurance from the federal

(stating "when WYO companies deplete their net premium income, a phenomenon that occurs regularly because the companies must forfeit a significant portion of the proceeds from their premiums, they draw money from FEMA through letters of credit to disburse claims"); *Gowland v. Aetna,* 143 F.3d 951, 955 (5th Cir.1998) (stating that payments made pursuant to a WYO issued policy are "a direct charge on the public treasury") (quotations omitted).

Because flood losses, whether insured by FEMA or by a participating WYO insurer, are paid out of the National Flood Insurance Fund, a claimant under a standard flood insurance policy must comply strictly with the terms and conditions that Congress has established for payment. *See* U.S. Const. art. I, § 9, cl. 7 (stating that funds may be drawn from the Treasury only by act of law); *Richmond,* 496 U.S. at 424, 434, 110 S.Ct. 2465. That is the simple, but powerful command of the Appropriations Clause.[11] Congress, through a valid act of delegation to FEMA, has authorized payment of flood insurance funds to only those claimants that submit a timely sworn proof of loss.[12] *See* 44 C.F.R. pt.

government was not a claim against the federal government for the purposes of applying the doctrine of equitable estoppel). *Lovell Mfg.* involves a separate agreement for reinsurance entered into between the federal government and a private insurer after the effective date of an insurance policy. *See id.* at 901. With reinsurance, a private insurer assumes the full risk of loss and transfers a portion of that risk to a second insurer or to a group of insurers. *See* Robert E. Keeton and Alan I Widiss, *Insurance Law: A Guide to Fundamental Principles, Legal Doctrines and Commercial Practices* § 1.3 (prac. ed.1988). When the federal government acts as a reinsurer, it is the private insurer's reinsurance claim, and not the policyholder's claim, that is directed toward the public fisc. *See Lovell Mfg.,* 777 F.2d at 901.

This case does not involve a separate agreement for reinsurance. Instead, it involves a claim against a fiscal agent of the United States on a standard flood insurance policy that was issued through the facilities of the federal government and for which the federal government, by way of regulation, has agreed to assume the full risk of loss. *See* 42 U.S.C. § 4055; 44 C.F.R. § 62.23(f). Though policyholders may file claims against WYO Insurers in federal court, we agree with the Third Circuit that the claim is, in reality, a claim against the federal government. *See Van Holt,* 163 F.3d at 165–67. We also note that the Third Circuit relied on *Gowland,* and not *Lovell Mfg.,* when deciding whether a claim against a WYO insurer is directed towards the public fisc. *See Van Holt,* 163 F.3d at 165, 167; *see also Gowland,* 143 F.3d at 955 (holding that a claim against a WYO insurer is a claim against the federal government for the purposes of applying the doctrine of equitable estoppel).

**11.** We also disagree with the dissent's characterization of our holding as relying on cases involving the doctrine of equitable estoppel or sovereign immunity. As discussed in the text of our opinion, our decision is based on the more expansive edict that funds in the Treasury may only be withdrawn in accordance with the terms and conditions set by Congress. *See* U.S. Const. art. I, § 9, cl. 7. The scope of that edict is not limited to cases involving equitable estoppel or sovereign immunity. *See Richmond,* 496 U.S. at 426, 110 S.Ct. 2465 (noting that the presidential power to pardon is limited by the Appropriations Clause) (citing *Knote v. United States,* 95 U.S. 149, 13 Ct.Cl. 517, 24 L.Ed. 442 (1877)).

**12.** Article 9(J) of the NFIP regulations provides in pertinent part:

> J. Requirements in Case of Loss: Should a flood loss occur to your insured property, *you must:*
>
> . . . . .
>
> 3. *Within 60 days after the loss, send us a proof of loss,* which is your statement as to the amount you are claiming under the policy *signed and sworn to by you* and furnishing us with the following information: [information omitted];
>
> . . . . .
>
> 6. The insurance adjuster whom we hire to investigate your claim may furnish you with a proof of loss form, and she or he may help you to complete it. However, this is a matter of courtesy only, and *you must still send us a proof of loss within 60 days after the loss even if the adjuster does not furnish the form or help you complete it.*
>
> . . . . .
>
> 7. *We may, at our option, waive the requirement for the completion and filing of a proof of loss in certain cases,* in which event you will be required to sign and, at our option, swear to an adjuster's report of the

61, app. A(1), art. 9(J)(3), (6). We therefore have no more power to award a money remedy to a flood insurance claimant who submits a sworn proof of loss after the 60 day time limit than we have to award a money remedy to a disability benefits claimant whose income exceeds a statutory earnings limit. *See* U.S. Const. art. I, § 9, cl. 7; *Richmond*, 496 U.S. at 424, 434, 110 S.Ct. 2465. The 60 day sworn proof of loss requirement is a condition precedent to payment for which all claimants are strictly accountable.

Flick nevertheless suggests that the rule of strict compliance should be inapplicable where the National Flood Insurance Program earns sufficient premiums to pay flood losses entirely out of written premiums.[13] We decline to accept that suggestion, because it ignores the simple fact that policyholder premiums are deposited in the National Flood Insurance Fund. That fund is located in the Treasury. *See* 44 U.S.C. § 4017(a), (d); *Sandia Oil Co.*, 889 F.2d at 263–64. Money may only be withdrawn from it through an act of law. U.S. Const. art. I, § 9, cl. 7. It is not relevant that the National Flood Insurance Fund may be currently self sustaining. *See Richmond*, 496 U.S. at 425, 110 S.Ct. 2465 (stating "[h]owever much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned") (quoting *Reeside v. Walker*, 52 U.S. 272, 291, 11 How. 272, 13 L.Ed. 693 (1850)). Nor is it relevant that the fund may consist entirely of policyholder premiums. *See id.* (stating that once "proceeds have been paid into the [T]reasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress") (quoting *Knote v. United States*, 95 U.S. 149, 154, 13 Ct.Cl. 517, 24 L.Ed. 442 (1877)).

We also decline to accept Flick's suggestion that we find an exception to the rule of strict compliance for flood induced subsidence cases. The terms and conditions of the standard flood insurance policy, which are defined by FEMA under authority from Congress, specifically limit the payment of funds from the National Flood Insurance Fund to claimants who submit a sworn proof of loss within 60 days of a flood loss. *See* 44 C.F.R. pt. 61, app. A(1), art. 9(J)(3), (6). Those same terms and conditions also permit FEMA to waive the sworn proof of loss requirement at its own behest. *See id.* at art. 9(J)(7). When read

---

loss which includes information about your loss and the damages sustained, which is needed by us in order to adjust your claim. *Id.* (emphasis added).

**13.** Flick suggests that the NFIP is self sustaining, because the NFIP has historically earned more premiums in a given year than it has paid losses. That conclusion is suspect. The financial condition of the NFIP cannot be ascertained simply by subtracting the historical amount of annual losses paid from the historical amount of annual premiums earned.

Indeed, two recent audits by the United States General Accounting Office ("GAO") have rejected such a line of reasoning. The NFIP's historical annual loss year is based only on FEMA's experience with the NFIP after 1978. Since that time, no catastrophic loss years have occurred, and many years were characterized by unusually low losses. The historical average loss year, therefore, involves less losses than can be expected in future years. Collecting premiums based on the average historical loss year, which is FEMA's current policy, prevents the NFIP from building sufficient reserves to meet future expected long term flood losses. According to the GAO, the NFIP is *not* actuarially sound. Losses from flood claims and expenses inevitably will exceed the funds available in some future years. *See National Flood Insurance Program: Before the House Subcomm. on Housing and Community Opportunity*, 106th Cong. ___ (1999) (statement of Stanley J. Czerwinski, Associate Director, United States General Accounting Office, Housing and Community Development Issues, Resources, Community, and Economic Development Division) (concluding that the NFIP currently is not actuarially sound); United States General Accounting Office, *Flood Insurance: Financial Resources May Not Be Sufficient to Meet Future Expected Losses*, Letter Report No. RCED–94–80, 3–3.3 (1994) (concluding that the NFIP was not actuarially sound as of fiscal year 1993).

together, the provisions of Article 9(J) indicate that FEMA sought to reserve to itself the exclusive power to dispense with the proof of loss requirement. That reservation of power is also a reservation of the delegated power to allocate public funds to claimants under exceptional circumstances. Though the circumstances of flood induced subsidence may tempt one to read the NFIP regulations leniently, the Supreme Court has cautioned us that not even the temptation of a hard case may elude the clear meaning of federal regulations. *See Richmond,* 496 U.S. at 420, 110 S.Ct. 2465 (citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 386, 68 S.Ct. 1, 92 L.Ed. 10 (1947)). Under the Appropriations Clause, we are powerless to order the payment of funds to claimants in circumstances that FEMA has not deemed exceptional.

Though our decision is premised on the Appropriations Clause, the outcome of this case is equally supported by the unique interests involved when the federal government participates extensively in a flood insurance program that is national in scope. The success of the NFIP, so far, has depended on the ability of the federal government and participating insurers to offer flood insurance at below actuarial rates. We find no reason to conclude that FEMA has structured flood insurance premiums in anticipation of the possibility that the federal government may have to pay the additional claims of policyholders who fail to comply strictly with the sworn

proof of loss requirement or who fail to obtain a valid waiver from the Federal Insurance Administrator. In adhering to a rule of strict compliance, we thus avoid disturbing the delicate balance, which FEMA has sought to strike, between the need to pay claims and the need to ensure the long term sustainability of the NFIP. We also avoid the inconsistent results that would occur were we to treat standard flood insurance policies differently depending on whether they are written by WYO insurers or FEMA.[14]

Our holding does not suggest that claimants must always strictly comply with the 60 day sworn proof of loss requirement. In the case of a loss due to flood induced subsidence or a similar misfortune, the federal government may well wish to grant relief from the rule of strict compliance. In fact, FEMA has designed a specific mechanism for requesting such relief. *See* 44 C.F.R. pt. 61, App. A(1), art. 9(J)(7) (allowing the Federal Insurance Administrator to waive the sworn proof of loss requirement).[15] Our decision merely recognizes the fact that, in the absence of congressional action or a valid waiver by FEMA, we may not dispense with the terms and conditions established for the payment of flood losses that are insured under standard flood insurance policies.

## IV

Having decided that a claimant under a standard flood insurance policy must

---

**14.** As discussed in the text, there is a compelling government interest in assuring uniformity of decision in cases involving the NFIP. *See Brazil,* 763 F.2d at 1075. We note that the disposition suggested by the dissent would lead to the anomalous result that standard flood insurance policies written by WYO insurers would be subject to special rules, such as the rule of notice prejudice or substantial compliance, while standard flood insurance policies written by FEMA would not. *See Seattle Fur Exchange v. FCIA,* 7 F.3d 158, 163 (9th Cir.1993) (applying the rule of strict compliance to an insurance policy issued, in part, by the federal government). Such a result would provide greater coverage at the same price to policyholders who purchase insurance through the WYO program and conflict with FEMA's goal that flood insurance poli-

cies be "standard." *See* 44 C.F.R. §§ 61.4(b), 61.13(d), 62.23(c), 62.23(d) (providing that the terms and conditions of flood insurance policies shall be fixed by FEMA and issued without alteration); 48 Fed.Reg. 46789 (1983) (stating that coverage under the WYO program is to be identical in scope and in price to coverage provided by FEMA).

**15.** We emphasize that Flick did not request the Federal Insurance Administrator to waive the sworn proof of loss requirement, despite the fact that she allegedly needed additional time to compile reports by experts to support her position. The issue of whether the denial of such a request would be proper is therefore not before us.

strictly comply with the 60 day sworn proof of loss requirement, we turn to the facts of this case. In the proceedings below, the parties stipulated that Liberty Mutual insured Flick against flood loss under a standard flood insurance policy. That policy was issued as part of the National Flood Insurance Program. The parties also stipulated that Flick suffered a flood loss on December 11, 1995, and that Flick did not submit a sworn proof of loss until September 17, 1996, approximately nine months after the date of loss. Because Flick failed to comply strictly with the policy's 60 day sworn proof of loss requirement, the district court properly granted summary judgment in favor of Liberty Mutual.

**AFFIRMED.**

SCHROEDER, Circuit Judge,
Dissenting:

This flood insurance claimant gave the insurance company timely notice of the existence of her claim and informed it of the full amount of the claim as soon as it was known. In holding she must nevertheless be denied insurance benefits because of a failure to comply to the letter with the policy provision requiring a sworn proof of loss within 60 days, the majority announces an unduly harsh and unworkable rule. The holding conflicts with our prior recognition that standard insurance law principles should apply to the administration of the National Flood Insurance Program and with generally recognized state-law principles that literal compliance with a proof of loss provision is not required where compliance was not possible, or where substantial compliance provided the insurer with adequate notice of the claim.

In this case, Irene Flick made a claim on February 6, 1996, under a flood insurance policy underwritten by Liberty Mutual. This was 56 days after the flood loss occurred. Liberty Mutual dispatched a claims adjuster who inspected the home, completed a national flood insurance re-

port, and noted the resettlement under the home, but concluded that the damage was not a result of the December 11th flooding. Flick attempted repeatedly to provide further information. On March 28, 1996, Flick's attorney offered to provide any information available in a proof of loss and requested a blank form for that purpose. However, the adjuster handling the claim insisted that Flick sign the report prepared by the adjuster which, according to Flick, contained numerous errors. Flick's claim was formally denied on April 8, 1996. On May 24, 1996, Flick's attorney again requested a form to be used for submitting proof of loss; on June 14, 1996, the adjusters again insisted that Flick sign the allegedly erroneous report.

After concluding the geophysical, structural, and financial analyses needed to evaluate the damage to her home, Flick's attorney submitted a sworn proof of loss on his own form on September 17, 1996. In a letter dated October 9, 1996, an adjuster rejected Flick's proof of loss form and stated that "the insured was given the form by the adjuster and I sent one to [Flick's attorney's] office with my 6/14/96 correspondence," apparently referring to the flawed report prepared by the original claims adjuster. This suit followed.

Flick contends, and the government does not dispute for purposes of this appeal, that she could not have provided a complete proof of loss statement within 60 days of the date of the flooding. In fact where, as here, the damage is caused by flood-induced ground subsidence under a foundation, it is probable that the full amount of loss can almost never be known within 60 days. Flick offers reports by experts in geotechnical engineering, structural engineering, construction and real estate appraisal in support of that position.

This court has held that "[i]n creating the [National Flood Insurance] Program, Congress did not intend to abrogate standard insurance law principles." *Brazil v. Giuffrida,* 763 F.2d 1072, 1074–75 (9th Cir.

1985) (citing *Hanover Building Materials v. Guiffrida,* 748 F.2d 1011, 1013 (5th Cir. 1984)); *Drewett v. Aetna Casualty & Surety Co.,* 539 F.2d 496, 497–98 (5th Cir.1976). Accordingly, although we are dealing with a federal insurance program, we are to "draw[ ] upon standard insurance law principles" when interpreting policies issued under this program. *Id.* (citing *West v. Harris,* 573 F.2d 873, 881 (5th Cir.1978)).

Under ordinary principles of insurance law applicable in a majority of states, including California, Flick's claim would be considered adequately presented and the 60–day proof of loss requirement excused on grounds of substantial compliance. *See* Windt, *Insurance Claims and Disputes* § 3.03 n. 23 (3d ed.1995) (citing cases); Croskey, Kaufman et al., *California Practice Guide: Insurance Litigation* § 3:166–67 (Rutter 1995). The claim Flick made on February 6, 1996, was sufficient to put the insurer on notice that further inquiry was required. In fact, after receiving Flick's notice of claim the insurance company did make further inquiry.

Also, in a growing majority of states an insurer can deny coverage for failure to submit a timely notification of loss only if the insurer proves prejudice as a result of the delay. *See* Ostrager & Newman, *Handbook on Insurance Coverage Disputes* § 4.02(c)(2)-(4) (9th ed.1998) (citing cases); *Insurance Litigation* at § 3.168–69; *see also Insurance Claims and Disputes* at § 3.03 n. 27 (noting that, in a majority of jurisdictions, a failure to submit a timely proof of loss will not result in denial of coverage unless prejudice is shown). It is difficult to see how the insurer was prejudiced by the failure to submit a sworn claim on a designated form until after February 10, 1996.

In rejecting the claimant's strong legal arguments, the majority confuses this case with cases against the United States involving sovereign immunity and claims of estoppel on the basis of inaccurate statements by government agents. *See Wagner v. Director, FEMA,* 847 F.2d 515, 518–20 (9th Cir.1988) (60–day proof of loss requirement for federal flood insurance claims had to be strictly construed in action against FEMA because it constituted a "condition[ ] precedent to a waiver by the federal government of its sovereign immunity"); *Federal Crop. Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947) (estoppel not available against the government despite reliance on erroneous statement by official); *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (estoppel not available against the government for monetary claim because Congress had not appropriated funds for such claims). This is not an estoppel case, nor is it a suit involving sovereign immunity. It is an insurance policy interpretation case that happens to involve insurance issued under a governmental subsidy program.

Moreover, there is nothing on the face of the policy to suggest the insured has a contractual relationship with anyone other than a private insurer, or that a claim made under the policy would be a direct charge on the public treasury. This case is therefore unlike *Seattle Fur Exchange v. FCIA,* in which this court required strict compliance with the terms of an insurance policy because it "specifically identifie[d a government agency] as the reinsurer" and therefore "provide[d] a direct contractual link" between the insured and the government agency. 7 F.3d 158, 163 (9th Cir. 1993). In fact, the matter before us more closely resembles *Lovell Mfg. v. Export-Import Bank,* 777 F.2d 894 (3d Cir.1985), a case distinguished by the *Seattle Fur Exchange* panel. In that case, the Third Circuit held that because no provision in a privately issued insurance policy outlined the reinsurance agreement between the private insurer and a government agency, the insured's claim was only against the private insurer and did not involve a charge on the Treasury. *See Lovell Mfg.,* 777 F.2d at 901.

There is no indication anywhere in the legislative history of the National Flood Insurance Act, and certainly not in the case law of our circuit, that harsher rules should apply in the flood insurance context than apply in the ordinary insurance context. Indeed, the majority's result thwarts one of Congress' primary goals in enacting the National Flood Insurance Act of 1968– ensuring that flood insurance coverage is "available on reasonable terms and conditions to persons who have need for such protection." 42 U.S.C. § 4001(a).

I therefore respectfully dissent.