**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STUDIO FRAMES LTD., d/b/a
Somerhill Gallery,
                    *Plaintiff-Appellee,*

v.

THE STANDARD FIRE INSURANCE
COMPANY,
                    *Defendant-Appellant,*

and

VILLAGE INSURANCE AGENCY,
INCORPORATED; BUSINESS
INSURERS OF THE CAROLINAS, LLC;
PHILIP D. PEARSALL; TRAVELERS
PROPERTY CASUALTY INSURANCE
COMPANY,
                    *Defendants.*

No. 05-2063

STUDIO FRAMES LTD., d/b/a
Somerhill Gallery,
              *Plaintiff-Appellant,*

              v.

THE STANDARD FIRE INSURANCE
COMPANY,
              *Defendant-Appellee,*

              and                                         No. 05-2342

VILLAGE INSURANCE AGENCY,
INCORPORATED; BUSINESS
INSURERS OF THE CAROLINAS, LLC;
PHILIP D. PEARSALL; TRAVELERS
PROPERTY CASUALTY INSURANCE
COMPANY,
              *Defendants.*

Appeals from the United States District Court
for the Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., Chief District Judge.
(CA-01-876-1)

Argued: September 18, 2006

Decided: April 12, 2007

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge Michael wrote the majority
opinion, in which Judge Motz joined. Judge Niemeyer wrote a dis-
senting opinion.

**COUNSEL**

**ARGUED:** Gerald Joseph Nielsen, NIELSEN LAW FIRM, L.L.C., Metairie, Louisiana, for Appellant/Cross-Appellee. John Albert Michaels, MICHAELS & MICHAELS, Raleigh, North Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Eric P. Stevens, POYNER & SPRUILL, Raleigh, North Carolina, for Appellant/Cross-Appellee.

---

**OPINION**

MICHAEL, Circuit Judge:

This appeal involves contractual and statutory coverage issues under a Standard Flood Insurance Policy issued pursuant to the National Flood Insurance Program. In a summary judgment awarding coverage to an insured tenant, the district court held that the tenant's leasehold improvements were insured under the building coverage portion of the policy and that the statutory cap on the dollar amount of coverage available did not bar the tenant from acquiring coverage, *see* 42 U.S.C. § 4013(b)(4). We affirm the summary judgment order. In the cross-appeal we affirm the district court's order denying pre- and post-judgment interest to the tenant because the federal flood insurance program is not a commercial enterprise.

I.

Studio Frames Ltd., a small art gallery, leases a store in the Eastgate Shopping Center in Chapel Hill, North Carolina. The shopping center is owned by Federal Realty Trust Investments (Federal Realty). In 1996 Hurricane Fran caused flood damage to Studio Frames's gallery. Studio Frames, which did not have flood insurance, obtained a disaster relief loan from the Small Business Administration. A loan condition required Studio Frames to buy flood insurance under the National Flood Insurance Program (NFIP) to cover the contents of the gallery and leasehold improvements made by the gallery. Thus, in 1996 Studio Frames bought a Standard Flood Insurance Policy (SFIP) from Standard Fire Insurance Company (Standard Fire), a private insurer authorized to sell federal flood insurance under the Federal

Emergency Management Agency (FEMA)'s "Write Your Own" or "WYO" program. *See* 42 U.S.C. §§ 4071(a), 4081; 44 C.F.R. §§ 62.23, 62.24.

An SFIP provides coverage for both real and personal property. Coverage A, or building coverage, covers the "entire building" as well as "fixtures, machinery and equipment." J.A. 144. Coverage B, or contents coverage, covers the insured's personal property located within the building. The contents coverage portion of an SFIP provides that a tenant "may apply up to 10% of the amount of insurance applicable to the personal property covered under this item, not as an amount of additional insurance, to cover loss to improvements to" the building made at the tenant's expense. J.A. 145. Studio Frames's policy listed $194,700 in building coverage and $287,200 in contents coverage. Studio Frames paid a premium that reflected the cost of these amounts of insurance.

On July 23-24, 2000, Studio Frames again suffered severe flood damage, and it immediately reported the event to Standard Fire. During the investigation of Studio Frames's loss, Standard Fire learned that Studio Frames did not own the building that housed the art gallery but instead leased the space from Federal Realty. Standard Fire further learned that Federal Realty had obtained in 1995, and continued to maintain, a $500,000 federal flood insurance policy with First Community Insurance Company to cover the building that housed Studio Frames's gallery. An adjuster for Standard Fire notified Studio Frames that it could not recover for losses to its leasehold improvements under the SFIP's building coverage provisions because it did not own the building. The adjuster explained, however, that Studio Frames could make a claim for leasehold improvement losses in an amount equal to ten percent of the contents coverage policy limit.

On September 20, 2000, Studio Frames submitted a proof of loss to Standard Fire. The gallery requested $287,200, the policy limit for contents coverage, and stated that it was reserving the right to file an additional proof of loss for damage to its leasehold improvements. (Studio Frames did not file the additional proof of loss because it believed Standard Fire had breached the policy when it took the position that the building coverage portion of the policy did not apply to the gallery.) Standard Fire disagreed with Studio Frames's assessment

of its contents losses. After several months of negotiations, Standard Fire paid $143,336.27 under the policy's contents coverage provision, allocated as follows: $114,616.27 for damage to inventory and $28,720 for damage to the leasehold improvements (ten percent of the contents coverage policy limit). Standard Fire also attempted to refund to Studio Frames the premiums it had paid for building coverage under the policy.

Thereafter Studio Frames sued Standard Fire in federal court for breach of contract, seeking (in the claim relevant to this appeal) $132,597.05 under the building coverage portion of the policy. The district court granted summary judgment to Standard Fire, concluding that Studio Frames was barred from recovery under the building coverage portion of the policy because the gallery had failed to submit a proof of loss for its leasehold improvements. In the appeal that followed, this court determined that Studio Frames's failure to submit a proof of loss would not preclude recovery if Standard Fire had repudiated the policy's building coverage before a proof of loss was due. *Studio Frames Ltd. v. Standard Fire Ins. Co.*, 369 F.3d 376, 383 (4th Cir. 2004). We remanded for further proceedings, noting that Standard Fire did not repudiate the policy unless it "was mistaken in its belief that the SFIP forbade it from offering [building] coverage to Studio Frames." *Id.*

On remand the district court concluded that Standard Fire had repudiated the policy because nothing in the SFIP prohibited building coverage for leasehold improvements. The court granted summary judgment to Studio Frames, holding that the gallery had building coverage and was entitled to $132,597.05 for damages to its leasehold improvements. *Studio Frames Ltd. v. Standard Fire Ins. Co.*, 397 F. Supp. 2d 674 (M.D.N.C. 2005). The court later denied Studio Frames's motion for pre- and post-judgment interest. Standard Fire appeals the summary judgment, contending that Studio Frames is not insured for its leasehold improvements under the building coverage portion of the SFIP. It argues, in the alternative, that Studio Frames has no building coverage because the statutory coverage limit was previously exhausted by Federal Realty's $500,000 SFIP on the building. *See* 42 U.S.C. § 4013(b)(4). Studio Frames cross appeals the district court's order denying it pre- and post-judgment interest. Our

review of the issues is de novo. *Battle v. Seibels Bruce Ins. Co.*, 288 F.3d 596, 603 (4th Cir. 2002).

## II.

We begin with a discussion of the purpose and nature of the National Flood Insurance Program created by Congress in 1968. *See* National Flood Insurance Act of 1968, Pub. L. 90-448, 82 Stat. 572 (1968). By the mid-1960s Congress was acutely aware that the country's growing population was occupying more and more land in flood-prone areas, both inland and along the seacoasts. H.R. Rep. No. 90-786, at 5 (1967). Flood losses were increasing at an alarming rate, and flood insurance on flood-prone property was not available from private insurance companies. *Id.* at 4. Recurring flood disasters required Congress to fund expensive "relief measures" that were "plac[ing] an increasing burden on the Nation's resources." 42 U.S.C. § 4001(a). These circumstances prompted Congress to create the NFIP, which (1) makes federally subsidized flood insurance available in flood-prone areas and (2) encourages states and localities to adopt land use policies and regulations that reduce the risk of flood damage. *Id.* § 4001(a)-(e); *Till v. Unifirst Fed. Sav. & Loan Ass'n*, 653 F.2d 152, 159 (5th Cir. 1981).

"To the extent possible, the NFIP is designed to pay operating expenses and flood insurance claims with premiums collected on flood insurance policies rather than with tax dollars." Government Accountability Office, Challenges Facing the National Flood Insurance Program, Statement by William O. Jenkins, Jr., October 18, 2005 (GAO Report), at 5. The program is not entirely self-sufficient, however, because Congress authorizes subsidized insurance rates for many older structures. National Flood Insurance Program, Actuarial Rate Review, November 30, 2004, at 7-8. About twenty-five percent of SFIP policyholders pay premiums below actuarial rates. *Id.* at 4. These subsidized premiums mean that the NFIP cannot accumulate sufficient reserves to cover catastrophic flood losses. *Id.* at 4-6. Thus, FEMA, which manages the NFIP, must rely on its statutory line of credit at the U.S. Treasury to pay claims arising from catastrophic losses. *Id.* at 3; *see* 42 U.S.C. §§ 4016(a), 4056(a).

Although the NFIP is not entirely self-sustaining, the program has reduced the amount of flood disaster relief needed from the federal

government. The program has paid billions in claims, "primarily from policyholder premiums that otherwise would have been paid through taxpayer-funded disaster relief or borne by home and business owners themselves." GAO Report at 2. FEMA estimates that every "$3 in flood insurance claims payments saves about $1 in disaster assistance payments." *Id.* Flood plain management efforts have also prevented an estimated $1 billion per year in flood damages.

FEMA, as authorized by statute and regulations, arranges for property insurance companies in the private sector, called Write-Your-Own or WYO companies, to issue and administer federal policies in their own names. 42 U.S.C. § 4081; 44 C.F.R. § 62.23. FEMA, in accordance with statutory parameters, establishes the terms and conditions of the standard policy (the SFIP), and the policy forms are codified as part of FEMA's regulations. 42 U.S.C. § 4013; 44 C.F.R. §§ 61.13, 61 App. (A)(1)-(3). WYO companies remit premiums collected, after deducting a scheduled amount for administrative expenses, to FEMA for deposit in the National Flood Insurance Fund. 42 U.S.C. § 4017(d). Claims are thus paid from federal funds.

If a WYO company disallows a claim under an SFIP, the statute allows the policyholder to sue FEMA in district court. 42 U.S.C. § 4072. FEMA regulations require the pertinent WYO company to defend the suit, and FEMA reimburses the company for defense costs. 44 C.F.R. § 62.23(i)(6). NFIP policyholders routinely sue the WYO company directly, and "a suit against a WYO company is the functional equivalent of a suit against FEMA," *Van Holt v. Liberty Mut. Fire Ins. Co.*, 163 F.3d 161, 166 (3d Cir. 1998), because a WYO company is a "fiscal agent[ ] of the United States," 42 U.S.C. § 4071(a)(1). By the same token, a money judgment against a WYO company for SFIP coverage is a charge on the federal treasury. *Gowland v. Aetna*, 143 F.3d 951, 955 (5th Cir. 1998).

### III.

Standard Fire contends that the summary judgment awarded to Studio Frames should be reversed for two reasons. First, it argues that the SFIP does not provide a tenant with building coverage for leasehold improvements. Second, it argues that the building coverage portion of Studio Frames's policy is void because the statutory $500,000 limit

on coverage applies to each structure and was exhausted by the owner's prior SFIP on the building. We consider these arguments in turn.

## A.

The first issue requires us to interpret the terms of the insurance policy. Standard Fire urges us to resolve doubts against the policy-holder, arguing that "if there is any ambiguity regarding the issue of coverage in the SFIP, the court should . . . limit exposure to the [U.S.] treasury and not expand coverage." Appellant's Br. at 51. Standard Fire's position is contrary to federal common law, which governs the interpretation of federal flood insurance policies. *Battle*, 288 F.3d at 607. Under federal common law, the federal courts draw upon standard principles of insurance law to resolve disputes over coverage in an SFIP. *Id.* at 607 n.17; *Hanover Bldg. Materials, Inc. v. Guiffrida*, 748 F.2d 1011, 1013 (5th Cir. 1984).

At least two principles of interpretation are relevant here. First, if the policy language in issue is clear and unambiguous, we apply it directly. Second, if the disputed language is ambiguous, or susceptible to different constructions, we adopt the construction most favorable to the insured. Of course, we will not torture language to create ambiguities. *Linder & Associates, Inc. v. Aetna Cas. & Sur. Co.*, 166 F.3d 547, 550 (3d Cir. 1999); *see also Hanover Bldg.*, 748 F.2d at 1013 (listing several principles of policy interpretation).

The policy interpretation issue is whether the SFIP permits tenants to acquire building coverage for their leasehold improvements. The building coverage portion, Coverage A, reads in pertinent part:

> This policy covers a building at the premises (the "building") which is described in the application, and includes:
>
> 1.   The entire building, for its real property elements . . . .
>
> 3.   Fixtures, machinery and equipment . . . all while within the building and owned by the named insured, as to which coverage is *not provided* under "Coverage B — PER-SONAL PROPERTY" . . . .

J.A. 144 (emphasis in original). Paragraph 3 plainly covers improvements, which the policy defines as "fixtures, alterations, or additions comprising a part of the insured building." J.A. 142. Although paragraph 3 covers improvements, Standard Fire argues that certain policy provisions must be read to deny building coverage to Studio Frames for its leasehold improvements.

1.

The building coverage portion of the policy, Coverage A, explicitly covers "a building," that is, "the 'building' . . . described in the application." J.A. 144. Standard Fire argues that because Studio Frames does not own the building, it has no insurable interest in it. Thus, the insurance company claims that Coverage A is void. The lack of an ownership interest does not necessarily translate into lack of an insurable interest. An insurable interest exists in property if the policyholder "derives a benefit from [the property's] existence or would suffer loss from its destruction." *Browning v. Browning*, 621 S.E.2d 389, 394 (S.C. 2005); *accord Valdez v. Colonial Country Mut. Ins. Co.*, 994 S.W.2d 910, 914 (Tex. App. 1999); *Technical Land, Inc. v. Firemen's Ins. Co.*, 756 A.2d 439, 445 (D.C. App. 2000). Here, Studio Frames spent its own money to make leasehold improvements that, in the policy's words, "comprise[d] a part of the insured building." J.A. 142. As a result, Studio Frames had an insurable interest in the building because it stood to suffer a loss if the building was damaged or destroyed. *See State Farm Auto Ins. Co. v. Raymer*, 977 P.2d 706, 711 (Alaska 1999) (stating that "the measure of an insurable interest in property is the extent to which the insured might be indemnified by loss, injury or impairment"); *Chicago Title & Trust Co. v. United States Fidelity & Guaranty Co.*, 511 F.2d 241, 247 (7th Cir. 1975). Unless excluded by some other policy language, the building coverage portion of the policy protected Studio Frames's insurable interest in the building to the extent of the leasehold improvements made by the gallery.

2.

Standard Fire next argues that Coverage A (for the building) and Coverage B (for contents or personal property), when read together,

limit a tenant's coverage for leasehold improvements to ten percent of the contents coverage limit. We disagree.

Before we get to Standard Fire's specific argument, we examine the basic language in Coverage A and Coverage B that is designed to distinguish between (and identify) items that are insured as "[f]ixtures, machinery and equipment" under Coverage A and items that are insured as "personal property" under Coverage B. Paragraph 3 of Coverage A provides coverage for "[f]ixtures, machinery and equipment, including the following [list of] property . . . as to which coverage is *not provided* under 'Coverage B — PERSONAL PROP-ERTY' . . . ." J.A. 144 (emphasis in original). The items listed in paragraph 3 of Coverage A include furnaces, wall mirrors perma-nently installed, fire extinguishing apparatus, venetian blinds, central air conditioners, outdoor antennas and aerials, and carpet permanently installed over unfinished flooring. Coverage B, section C, has a paral-lel provision: "Coverage for personal property includes the following [listed] property . . . for which coverage is *not provided* (irrespective of the manner in which the property is installed or adapted to the building) under 'Coverage A — BUILDING PROPERTY' . . . ." J.A. 145 (emphasis in original). The personal property items listed in sec-tion C of Coverage B include washers, dryers, food freezers, portable microwave ovens, installed air conditioning units, and carpet over fin-ished flooring (whether permanently installed or not).

These parallel provisions are written to give applicants for federal insurance and insureds a clear picture — sometimes in gray areas — as to what items are insured as fixtures, machinery, and equipment under Coverage A (for the building) and what items are insured as personal property under Coverage B. This fuller differentiation assists property owners, particularly landlords and tenants, in deciding whether building coverage alone or contents coverage alone is suffi-cient or whether both coverages are necessary to protect their inter-ests.

With the policy's purpose for spelling out the distinction between the two coverages in mind, we turn to Standard Fire's argument that a tenant's coverage for leasehold improvements is limited to ten per-cent of contents coverage. Standard Fire begins with the language in Coverage A (building coverage) that covers "machinery, fixtures and

equipment . . . as to which coverage is *not provided* under 'Coverage B — PERSONAL PROPERTY.'" J.A. 144 (emphasis in original). The insurance company then cites Coverage B, section E, which states:

> The Insured, if not an owner of the described building, may apply up to 10% of the amount of insurance applicable to the personal property covered under this item, not as an additional amount of insurance, to cover loss to improvements to the described building which have been made, or acquired, at the expense of the Insured . . . even though the improvements are not legally subject to removal by the Insured.

J.A. 145. Thus, Standard Fire argues, a tenant's leasehold improvements cannot be insured under the building coverage portion of the policy because the improvements can be partially insured under the contents coverage portion, Coverage B.

These two provisions do not clearly prohibit building coverage for a tenant's leasehold improvements. The term "coverage" in Coverage A's phrase, "as to which coverage is not provided under 'Coverage B,'" is susceptible to different constructions. On the one hand, an insurer's promise to pay any amount of money, however small, for damages to insured property constitutes *some* coverage. Under this construction, coverage would not be available under Coverage A. On the other hand, it is natural to read the word "coverage" in the way it is contemplated in the insuring clause, that is: full coverage up to "actual cash value" or the "cost to repair or replace," whichever is less, subject, of course, to policy limits. J.A. 140. Under the second construction, building coverage for leasehold improvements is available under Coverage A because full coverage is not provided under Coverage B. The ambiguity in the use of the word "coverage" in the "as to which coverage is not provided under 'Coverage B'" language requires us to adopt the second construction, the one most favorable for the insured.

Other factors support this result. As we have already discussed, the basic purpose of the reciprocating "as to which coverage is not provided" language in both parts of the policy is to assist property own-

ers in determining whether they need both building and contents coverage or whether one is sufficient. This effort to assist policyholders in their decisionmaking leads us to conclude for more specific reasons that the "as to which coverage is not provided in 'Coverage B'" language is not intended to be coupled with section E in Coverage B to prevent a tenant from fully insuring leasehold improvements under building coverage. Rather, section E appears to be included to accommodate the many tenants that do not make extensive leasehold improvements and therefore do not need a separate policy to cover improvements. Section E provides these tenants the option of using ten percent of their contents coverage (Coverage B) to protect any leasehold improvements, relieving them of the need to buy the additional building coverage.

Coverage B, section E, however, is not designed for tenants (long-term business tenants, for example) that make extensive investments in both personal property and tenant improvements. The provision offers the tenant making costly leasehold improvements very little, if any, protection for these improvements. The ten percent of contents coverage that may be allocated to leasehold improvements is far too low to cover substantial improvements. Moreover, this ten percent allotment is not even additional insurance. It has no value unless personal property loss does not consume all of the contents coverage. The extremely low limit on coverage for leasehold improvements in Coverage B, section E, makes sense only if a tenant needing more protection can acquire it under Coverage A, the building coverage portion of the policy. Indeed, the low ten percent limit appears designed to encourage tenants that make substantial improvements to buy Coverage A.

In sum, we conclude that Coverage A and Coverage B, when read together, do not prevent a tenant from buying building coverage for leasehold improvements.

### 3.

Standard Fire next argues that because the building owner, Federal Realty, had already insured the building, the SFIP's duplicate policy provision barred Studio Frames from acquiring building coverage.

Article 8(W) of the policy, "Duplicate Policies Not Allowed," pro-
vides:

> Property may not be insured under more than one policy
> issued under the Act. When the Insurer finds that duplicate
> policies are in effect, the Insurer shall by written notice give
> the Insured the option of choosing which policy is to remain
> in effect.
>
> 1.   If the Insured chooses to keep in effect the policy with
> the earlier effective date, the Insurer shall by the same writ-
> ten notice give the Insured an opportunity to add the cover-
> age limits of the later policy to those of the earlier policy,
> as of the effective date of the later policy.
>
> 2.   If the Insured chooses to keep in effect the policy with
> the later effective date, the Insurer shall by the same written
> notice give the Insured the opportunity to add the coverage
> limits of the earlier policy to those of the later policy, as of
> the effective date of the later policy.

J.A. 154. It is unclear whether "property" as used in this article refers
to a property interest or to physical property, such as a structure. If
"property" refers to property interest, multiple policies could cover a
single piece of property so long as the policies covered distinct inter-
ests.

When we consider context, here, the language that follows the
word "property," we conclude that the word refers to a property inter-
est. The exclusive reference to the "insured," rather than the "in-
sureds," indicates that the article only applies to duplicate policies
held by a single insured or policyholder. If the drafters of the policy
had intended to bar multiple policyholders from each holding a policy
on a piece of property, then the drafters would have referred to the
"insureds" when they set forth the procedures that a WYO company
must follow once it discovers a duplicate policy.

The procedures for dealing with duplicate policies provide further
support for the conclusion that "property" means an interest in prop-

erty. Article 8(W) states, "When the Insurer finds that duplicate policies are in effect, the Insurer *shall* . . . give the Insured the option of choosing which policy is to remain in effect." J.A. 154 (emphasis added). This directive to the WYO company does not contemplate a situation, such as the one in this case, where multiple policyholders each have a policy on the same property. Indeed, under Standard Fire's interpretation, it would be futile for insurers to act under this directive because each policyholder would no doubt choose to keep its own (single) policy in effect. Article 8(W) does not include any mention of what procedures a WYO is to follow when it discovers that multiple policyholders have policies covering the same property. This omission indicates that Article 8(W) only prohibits a single insured from maintaining duplicate policies covering the same property interest.

The policies here were acquired by two different insureds, Federal Realty and Studio Frames, and they cover different property interests. Accordingly, neither Federal Realty's nor Studio Frames's policy is barred under Article 8(W).

### B.

We now turn to the statutory construction issue. When Studio Frames, the tenant, obtained the SFIP providing $194,700 in building coverage, Federal Realty, the building owner, already had in place an SFIP with a building coverage limit of $500,000. Standard Fire contends that Studio Frames's building coverage is void because it exceeds the $500,000 statutory limit in 42 U.S.C. § 4013(b)(4). That section states:

> [I]n the case of any nonresidential property, including churches, for which the risk premium rate is determined in accordance with the provisions of section 4014(a)(1), additional flood insurance in excess of the [$100,000] limits specified in subparagraphs (B) and (C) in paragraph (1) shall be made available to every insured upon renewal and every applicant for insurance, in respect to any single structure, up to a total amount (including such limit specified in subparagraph (B) or (C) of paragraph (1), as applicable) of

$500,000 for each structure and $500,000 for any contents related to each structure . . . .

42 U.S.C. § 4013(b)(4). Standard Fire argues that the $500,000 limit is intended to cap the aggregate amount of insurance available on each structure. Studio Frames responds that the statute simply limits the amount of insurance each insured can acquire on any one structure.

To resolve this dispute, we first determine whether § 4013(b)(4) has a plain and unambiguous meaning. If so, our inquiry ends and the plain meaning controls. In deciding whether statutory language is plain or ambiguous, we look to the "language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

The language in § 4013(b)(4) can be read to support different interpretations of the $500,000 cap. The words "up to a total amount . . . of $500,000 for each structure" suggest an aggregate cap on the insurance available on each structure. On the other hand, the words "shall be made available to every insured . . . in respect to any single structure" suggest that the $500,000 cap refers to the amount of insurance each policyholder can buy on each structure.[1] A look at the specific context in which the inconsistent language is used in § 4013(b)(4) reveals only that Congress intended to place limits on the amount of coverage available. The specific context thus gives no indication whether the cap is meant to limit the amount of insurance sold on each structure or the amount sold to each insured on each structure.

---

[1]The dissent drops words from § 4013(b)(4) to suggest that the section should be read as follows: "Flood insurance shall be made available, in respect to any single structure, up to a total amount of $500,000 for each structure and $500,000 for any contents." *Post* at 23. This reading — or rewriting — omits the direct object of "shall be made available," which is, "to every insured upon renewal and every applicant for insurance." As we indicate above, the direct object supports a reading that the $500,000 cap represents the amount available to each policyholder on each building.

When the inconsistent passages are considered in the context of the broader statute, the resulting impression favors the interpretation that "up to a total amount . . . of $500,000" refers to the amount of insurance available to each policyholder. Broadly speaking, § 4013(b) authorizes nonresidential insurance at subsidized and unsubsidized rates. Qualifying applicants can receive limited coverage at subsidized rates, *see* § 4013(b)(1), and more extensive coverage at actuarial rates, *see* § 4013(b)(2)-(4). Thus, the "up to a total amount" language in § 4013(b)(4) may be reasonably read to mean that the $500,000 statutory limit encompasses the total amount of insurance available to each policyholder, the subsidized amount under § 4013(b)(1) plus the unsubsidized amount under § 4013(b)(4).[2] Thus, viewed in the broader context of the statute, the "up to a total amount" language does not support the interpretation that the $500,000 cap is an aggregate cap for each structure.

Although the broader context analysis tilts toward the interpretation urged by Studio Frames, we believe that § 4013(b)(4)'s coverage limitation language is sufficiently ambiguous to warrant further analysis, using additional tools of statutory construction. *See S.J. & W. Ranch, Inc. v. Leatinan*, 913 F.2d 1538, 1540-41 (11th Cir. 1990).

---

[2]The dissent argues that it would be anomalous to have the per structure cap that Congress has imposed on the subsidized building coverage in § 4013(b)(1)(B), and yet not have a per structure cap on the unsubsidized coverage in § 4013(b)(4). *Post* at 25-26. There is a logical rationale for such an approach. Because subsidized insurance imposes substantially greater costs on the government, Congress for that reason could have chosen to place the per structure cap on only the subsidized insurance. The dissent also contends that having a per structure cap for subsidized insurance and a per policyholder cap for unsubsidized insurance would present administrative problems: "There would be no explanation as to who might receive the subsidized building coverage, or what to do if the landlord or one tenant, acting quickly, has purchased all the subsidized building coverage." *Id.* These problems would also be present under the dissent's interpretation of the statute, which would impose a per structure cap on unsubsidized insurance. For example, if the dissent's interpretation was adopted, one applicant for insurance, acting quickly, could buy up all of the subsidized and unsubsidized insurance available on a building, thus preventing others with insurable interests from acquiring any coverage at all.

In 1994 Congress amended § 4013(b)(4)'s coverage limitation language. To resolve its meaning, it is appropriate for us to compare the pre- and post-amendment language, *Bailey v. United States*, 516 U.S. 137, 147 (1995), consider the purpose of the amendment, *McCreary County v. ACLU*, 125 S. Ct. 2722, 2734 (2005), and review any relevant legislative history, *United States v. R.L.C.*, 503 U.S. 291, 298 (1992); *McCreary*, 125 S. Ct. at 2734.

Prior to the 1994 amendment, § 4013(b)(4) read:

> Additional flood insurance . . . shall be made available . . . up to an amount equal to (i) $250,000 plus (ii) $200,000 multiplied by the number of such occupants which coverage shall be allocated among such occupants (or among the occupant or occupants and the owner) . . . except that the aggregate liability for the structure itself may in no case exceed $250,000 . . . .

Pub. L. 95-128, Title VII § 704(a), 91 Stat. 1145 (1977). In this version Congress placed an aggregate cap on the coverage for *each structure* and a separate cap on the coverage *each occupant or policyholder* could obtain for contents within the structure.

The 1994 amendment made two significant changes: (1) it deleted the phrase, "except that the aggregate liability for the structure itself may in no case exceed $250,000;" and (2) it used simpler, parallel language in increasing the cap to "$500,000 for each structure and $500,000 for any contents related to each structure." Pub. L. 103-325, Title V § 573(a)(3), 108 Stat. 2278 (1994).

These changes eliminated the language differences in the description of the structure cap and the contents cap. Prior to 1994 the structure cap was written to apply as an "aggregate liability" cap on each structure, and the contents cap was written to apply to each "occupant" or policyholder. The present statute describes the two coverage caps in the same way: coverage "shall be made available to every insured . . . in respect to any single structure, up to a total amount . . . of $500,000 for each structure and $500,000 for any contents related to each structure." § 4013(b)(4). The statute's use of parallel language in describing the structure and contents caps reveals that they should

be applied in the same way: either as limits on the total coverage available on the structure ($500,000) and on the contents in the structure added together ($500,000), or as limits on the total coverage available to each insured on the structure and to each insured on any contents. Either interpretation, of course, will alter the pre-1994 method of calculating coverage caps. The clear wording of the 1994 amendment, however, does not permit us to apply the structure cap in one manner and the contents cap in a different manner. Thus, we must determine whether Congress intended to (1) replace the aggregate, per structure cap on building coverage with a per policyholder cap or (2) replace the per policyholder cap on contents coverage with an aggregate cap on the contents within a structure. Application of the caps to each structure and the sum of its contents would reduce the government's potential liability, but would also reduce the number of policies written and the amount of premiums collected. Application of the caps to each insured would increase the government's potential liability, but would also attract more policyholders and more premium revenue.[3]

---

[3] It is not clear whether the dissent believes that the building and contents coverage caps must be applied in the same manner. At one point, the dissent appears to interpret the statute to place an aggregate cap on both building and contents coverage. *Post* at 23 (stating that "the [statute] gives the limit of $500,000 for the building and $500,000 for its contents"). At another point, however, the dissent relies on a footnote in a chart in FEMA's regulations, 44 C.F.R. § 61.6(a), that states that contents coverage limits are applied "per unit." According to the dissent, "By explicitly making coverage for *contents* on a 'per-unit' basis, but not coverage for the *building*, FEMA understood that building coverage would *not* be on a per-unit basis." *Post* at 27 (emphases in original). The dissent thus relies on FEMA's understanding of the building coverage cap, but overlooks the agency's inconsistent understanding of the contents coverage cap. Neither the dissent nor FEMA (in its regulations) explains how the parallel language in § 4013(b)(4) can permit a different type of cap for building coverage than it does for contents coverage. As we have said, the clear language of § 4013(b)(4) requires that the building and contents coverage caps be interpreted in the same manner. Thus, to the extent FEMA's regulation interprets the statute to create a different (per structure) cap for building coverage, the interpretation is inconsistent and not entitled to deference.

Standard Fire urges us to interpret the statute to require the more restrictive application, which would, it argues, "accord deference to Congress's intent to limit exposure to the treasury and not expand coverage." Appellant's Br. at 51. Further analysis reveals, however, that the 1994 amendments were intended to increase coverage and broaden participation in the federal flood insurance program.

First, Congress, in the 1994 amendment, deleted the "aggregate liability for the structure" language. This deletion suggests that Congress intended to replace the aggregate per structure cap with a per policyholder cap for building coverage.

Second, the 1994 amendments were part of an ongoing effort to "increase the number of people covered by flood insurance." 140 Cong. Rec. 9105 (May 3, 1994) (statement of Rep. Kennedy); *see also* Rate Review at 5 (FEMA reaffirming that it is "sound public policy to maximize the number of people who have [government-backed] flood insurance"); GAO Report at 14 (GAO stressing the need to "increase participation in the [National Flood Insurance] [P]rogram"). Low participation in the National Flood Insurance Program has in part contributed to FEMA's inability to build the reserves necessary to pay all claims every year, which requires the agency to burden the taxpayer by borrowing from the U.S. Treasury. 140 Cong. Rec. 9105 (statement of Rep. Kennedy). In order to attract new policyholders and more premium dollars, Congress has periodically increased the coverage limits. Congress raised the aggregate cap on nonresidential structures from $30,000 to $100,000 in 1973, Pub. L. 93-234, Title I § 101, 87 Stat. 978 (1973), and to $250,000 in 1977, Pub. L. 95-128, Title VII § 704(a), 91 Stat. 1145 (1977). Despite these increases in coverage limits, the NFIP, as late as 1993, continued to suffer from a "distressfully low rate of participation." 139 Cong. Rec. E 2331 (Sep. 30, 1993) (statement of Rep. Kennedy). Thus, the next year Congress again increased the coverage limits and amended the language governing their application.

Given these efforts to expand participation and increase premium revenue, Congress surely did not intend to eliminate the per policyholder cap on contents coverage. Applying the contents coverage cap to the building contents added together would mean that many insureds (tenants in large buildings, for example) could no longer

obtain anything approaching full coverage for contents (their personal property). Thus, we conclude that Congress did not intend for the 1994 amendment to eliminate the per policyholder cap on contents coverage. Because the structure cap is written in the same way as the contents cap, and therefore should be applied in the same way, we conclude that the structure cap is also a per policyholder cap.

For the foregoing reasons, we conclude that § 4013(b)(4) permits each policyholder to acquire up to $500,000 in building coverage. Thus, Studio Frames's building coverage, which provided $194,700 in coverage for leasehold improvements, does not exceed the statutory limit.

### C.

Because building coverage for Studio Frames's leasehold improvements is not prohibited under either the policy or the governing statute, we affirm the district court's conclusion that Standard Fire breached its insurance contract with Studio Frames and that the gallery is entitled to $132,597.05 in damages for this breach.

### IV.

Finally, we consider Studio Frames's cross-appeal of the district court's order denying it pre- and post-judgment interest. Studio Frames argues that the National Flood Insurance Program falls within the commercial activity exception to the general rule immunizing the government from the payment of interest.

As we pointed out in part II, *supra*, a suit against a WYO company is essentially a suit against FEMA. Likewise, a money judgment against a WYO company is essentially a judgment against the government. *See Gowland*, 143 F.3d at 955. There is, of course, a no-interest rule "to the effect that interest cannot be recovered in a suit against the government in the absence of an express waiver of sovereign immunity from an award of interest." *Library of Congress v. Shaw*, 478 U.S. 310, 311 (1986). Congress has not waived the no-interest rule here, but it does not apply "'where the government has cast off the cloak of sovereignty and assumed the status of a private commer-

cial enterprise.'" *Sandia Oil Co. v. Beckton*, 889 F.2d 258, 261 (10th Cir. 1989) (quoting *Shaw*, 478 U.S. at 317 n.5). The NFIP would be a commercial enterprise if "it engage[d] in business-type activity" with the intent to make a profit. *Id.* at 263; *see also United States v. Worley*, 281 U.S. 339 (1930) (holding that a government sponsored veterans' insurance program was not a commercial venture because it was not designed to be profitable).

We conclude that the NFIP is not a commercial enterprise. The NFIP was designed as, and continues to operate as, a not-for-profit program. *See* GAO Report at 4 (stating that the program is "not actuarially sound"); *Newton v. Capital Assur. Co.*, 245 F.3d 1306, 1310 (11th Cir. 2001). A large percentage of policyholders pay below-actuarial rates authorized by statute, which prevents the program from building the reserves necessary to pay off catastrophic losses. To keep the NFIP solvent, FEMA relies on its line of credit with the federal treasury, drawing on that source from time to time in order to pay claims. *See* part II, *supra*. In 2006, for example, Congress increased FEMA's borrowing authority to $20.775 billion to enable the agency to pay policy claims arising from Hurricane Katrina. Pub. L. 109-208, 120 Stat. 317 (2006). For these reasons, we agree with several of our sister circuits that the NFIP is not a commercial enterprise and that the no-interest rule applies to a suit against FEMA or a WYO company. *See In re Estate of Lee*, 812 F.2d 253, 256 (5th Cir. 1987); *Sandia Oil*, 889 F.2d at 263; *Newton*, 245 F.3d at 1312; *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 193 (2d Cir. 2006). The district court correctly denied Studio Frames's motion for interest.

V.

We affirm the district court's orders granting summary judgment to Studio Frames and denying Studio Frames's motion for pre- and post-judgment interest.

*AFFIRMED*

NIEMEYER, Circuit Judge, dissenting:

Under the National Flood Insurance Program, Congress provides flood insurance with defined limits for commercial properties and

with different limits for residential properties, all as specified by statute. When, as the majority concludes, the statute's specification of those limits is ambiguous, we must construe the statute *narrowly* so as not to appropriate more money for insurance coverage than Congress intended. The majority violates this fundamental principle, applying private contract law principles to favor insureds and thus to expand coverage at the expense of the public fisc. This is a fundamental error of law.

Particularly, the majority finds ambiguity in the limits of coverage provided by 42 U.S.C. § 4013(b)(4), which provides flood insurance for commercial properties. It then resolves the ambiguity against Congress and in favor of providing increased amounts of insurance coverage without concluding that those amounts are *clearly* authorized by the text of the statute. It does this (1) by applying the canon of private contract law that ambiguous insurance policies be construed against the drafter, and (2) by relying on the generally stated purpose of the insurance program. This approach, however, violates the bedrock norm of authorizing no more money from the public fisc than Congress clearly intended. It also undertakes statutory construction backwards — by looking first at the statute's benevolent purpose and then making the text fit that purpose.

Because the text of 42 U.S.C. § 4013(b)(4) and related factors demonstrate that the statute provides an aggregate limit for commercial flood insurance coverage on a *per-structure* basis, I dissent from the majority's conclusion that holds the stated limit to be available for *each insured* — a holding that substantially expands the government's financial obligations. My position is supported by both the statute's text and its context.

In authorizing commercial flood insurance, 42 U.S.C. § 4013(b)(4) provides limits as follows:

> [I]n the case of any nonresidential property, [unsubsidized] flood insurance . . . shall be made available to every insured upon renewal and every applicant for insurance, *in respect to any single structure*, up to a total amount . . . of $500,000 for each structure and $500,000 for any contents related to each structure. . . .

(Emphasis added). The majority opinion assigns no relevant meaning to the phrase "in respect to any single structure," concluding that the limit applies to each separate insured, not each "single structure." Yet, this is a key phrase in the paragraph at issue and a phrase whose meaning can be ascertained by a careful reading of the text.

The subject of the sentence is "insurance"; the verbal phrase is "shall be made available"; and three prepositional phrases then follow, set off by serial commas: (1) "to every insured . . . ," (2) "in respect to any single structure," (3) "up to a total amount . . . ." As written, the prepositional phrase "in respect to any single structure" can only modify the verb, "shall be made available," because it does not make sense modifying "insured." Thus, the operative language reads: "Flood insurance shall be made available, in respect to any single structure, up to a total amount of $500,000 for each structure and $500,000 for any contents." On this reading, it is clear that coverage is provided on a per-structure basis.[1]

Moreover, as so read, the language is not "inconsistent," as the majority finds in dismissing the language. The language is only inconsistent when one ignores the role that the three prepositional phrases play in the sentence — that they *all* modify the verb. The first phrase answers the question: "To whom and when may insurance be made available?" The second answers the question: "With regard to what may insurance be made available?" And the third phrase answers the question: "In what amount may insurance be made available?" Because the phrases are set off with serial commas, it is clear that each phrase modifies the verb of the sentence, not a noun within another prepositional phrase. And because all three phrases modify the verb, they progressively and cumulatively narrow the verb. "Up to a total amount" modifies the verb, as previously modified by the "in respect to any single structure" language. Quantifying the coverage that "shall be made available" "in respect to any single structure," the paragraph gives the limit of $500,000 for the building and $500,000 for its contents. The "up to a total amount" phrase cannot

---

[1] The prepositional phrase, "to every insured upon renewal and every applicant" is included to indicate that one acquires new coverage at the renewal date or on the commencement of a new policy period, not in the middle of one.

somehow modify "insured," as the majority impliedly believes. "Insureds" cannot be quantified by dollars. The majority's implied reading ignores the commas that set the phrases off from each other and thereby preclude one phrase from modifying another. The "up to a total amount" phrase modifies "shall be made available," *subject to all the modifications that have already been made*. Since the modifications include the "in respect to any single structure" language, it is clear that the cap acts as a limit on *per-structure coverage* and not on per-insured coverage.

In addition to this textual analysis, six factors point to the interpretation that the statute provides a *per-structure* limit, *not a per-insured* limit, for commercial flood insurance.

*First* is the relationship of § 4013(b)(4) (providing commercial coverage) with § 4013(b)(2) (providing residential coverage). Paragraph (b)(2) provides the limits of insurance coverage for residential structures, stating:

> [I]n the case of any residential property, [unsubsidized] flood insurance shall . . . be made available to every insured upon renewal and every applicant for insurance *so as to enable such insured or applicant to receive coverage* up to a total amount . . . of $250,000.

(Emphasis added). Thus, in the case of residential property, it is crystal clear that *each insured* can get up to $250,000 in coverage, *with no aggregate cap for the building*. The majority's reading of the statute fails to account for paragraph (b)(2) in two ways. First, it fails to explain why (b)(4) and (b)(2) would express the exact same concept — that *each insured* can get a certain amount of coverage without regard to the total insurance on the entire building — in completely different ways. Congress knew how to reach the result that the majority is after, and did so unambiguously in paragraph (b)(2). That Congress did not do so in (b)(4) should be dispositive. Second, the majority's reading fails to give any meaning to the phrase in (b)(4) "in respect to any single structure." That phrase is present in (b)(4), but not in (b)(2). Yet on the majority's reading, it is given no meaning at all, as the same result can be reached with or without the phrase. Whatever role the majority could assign to the phrase "in respect of

any single structure" in (b)(4) cannot be squared with its exclusion in (b)(2) — it is simply surplusage in (b)(4). I would hold that the phrase does have a meaning, and that meaning can only be to limit the coverage available for commercial structures to $500,000 for each *structure*.

*Second* is the relationship of § 4013(b)(4) coverage with § 4013(b)(1) coverage. Paragraph (b)(1) provides *subsidized* flood insurance, providing a first tier of insurance. Paragraph (b)(4) provides a second tier of *unsubsidized* flood insurance once the limits available in (b)(1) are exhausted. The amount of available *subsidized* coverage is specified:

> [I]n the case of business properties which are owned or leased and operated by small business concerns, an aggregate liability with respect to any single structure, including any contents thereof related to premises of small business occupants . . . which shall be equal to (i) $100,000 plus (ii) $ 100,000 multiplied by the number of such occupants and shall be allocated among such occupants (or among the occupant or occupants and the owner) under regulations prescribed by the Director; except that the aggregate liability for the structure itself may in no case exceed $100,000 . . . .

42 U.S.C. § 4013(b)(1)(B). This paragraph unambiguously caps the aggregate coverage for "any single *structure*" at $100,000. It would be anomalous to say that subsidized building coverage under paragraph (b)(1) is capped at $100,000, but that unsubsidized building coverage under paragraph (b)(4) is uncapped, as the majority concludes.[2] There would be no explanation as to who might receive the subsidized building coverage, or what to do if the landlord or one ten-

---

[2]The inclusion in subparagraph (b)(1)(B) of the explicit cap on "aggregate liability for the structure" is necessary to make clear that even though total subsidized coverage for both contents and structure is capped only by the number of tenants, the coverage for the structure itself is capped at $100,000. Such language is unnecessary in § 4013(b)(4) because (b)(4) caps coverage for both structure and contents at the same level ($500,000).

ant, acting quickly, has purchased all the subsidized building coverage, leaving none for any other tenant in the building.

*Third* is the relationship between the current version of § 4013(b)(4), as amended in 1994, and the prior version (1993). Paragraph (b)(4) as it existed in the prior 1993 version read:

> [I]n the case of business property owned, leased, or operated by small business concerns . . . [unsubsidized] flood insurance . . . shall be made available to every such owner, lessee, or operator in respect to any single structure, including any contents thereof, related to premises of small business occupants (as that term is defined by the Director), up to an amount equal to (i) $250,000 plus (ii) $200,000 multiplied by the number of such occupants which coverage shall be allocated among such occupants (or among the occupants or occupants and the owner) in accordance with the regulations prescribed by the Director pursuant to such subparagraph (B), *except that the aggregate liability for the structure itself may in no case exceed $250,000 . . . .*

42 U.S.C. § 4013(b)(4) (1993 version) (emphasis added). The change in language between the 1993 version of the statute and the current version provides the best basis for the majority's reading of the statute. The majority correctly notes that we generally assume that changes in statutory language are meaningful. In this case, however, the majority provides no textual basis for its understanding of the *current* version of the statute, so it cannot say *how* the amendment changed the intended meaning, only that it must somehow be different. But based on my reading of the current statute, the language that was included in the prior 1993 version — "except that the aggregate liability for the structure itself may in no case exceed $250,000" — was omitted from the current statute because it was redundant. This is reinforced by the inclusion in the current statute of the serial commas setting off the prepositional phrase "in respect to any single structure." The commas restructured the sentence, applying limits on a per-structure basis, and thus removed the need for the now-redundant "aggregate liability" language that had been included in the 1993 version.

*Fourth*, the regulations promulgated by FEMA under § 4013(b)(2) provide an administrative interpretation of the available limits of

insurance which contradicts the majority's analysis. *See* 44 C.F.R. § 61.6. In § 61.6(a), the regulation lists the limits available for flood insurance of various kinds, including the commercial insurance under § 4013(b)(4). For nonresidential small business properties, the regulation lists the *total building coverage* available as $500,000. For *contents* coverage, the regulation specifies that limits are on a "per unit" basis. *Id.* § 61.6(a) n.2. By explicitly making coverage for *contents* on a "per-unit" basis, but not coverage for the *building*, FEMA understood that building coverage would *not* be on a per-unit basis. In fact, when FEMA wanted to insure residential *buildings* on a per-unit basis under § 4013(b)(2), it made the coverage clear. Thus, § 61.6(b) provides that "[i]n the insuring of a *residential condominium building* in a regular program community, the maximum limit of building coverage is $250,000 times the number of units in the building." *Id.* § 61.6(b). If residential coverage under 42 U.S.C. § 4013(b)(2) were to be parallel with nonresidential coverage under § 4013(b)(4), as the majority asserts, it is inexplicable that FEMA would specify that insurance of paragraph (b)(2) losses is on a per-unit basis, but not insurance of paragraph (b)(4) losses, such as the losses here. We must not be so quick to ignore the agency's considered opinion, especially when, as the majority concedes, the statute is ambiguous.

*Fifth*, the majority's reliance on a particular brand of legislative history vividly demonstrates the sinister snare inherent in such reliance. The majority cites a statement of Representative Joseph Kennedy that the 1994 bill was intended to "increase the number of people covered by flood insurance." 140 Cong. Rec. H2961 (daily ed., May 3, 1994) (statement of Rep. Kennedy). Indeed, this seems to be the key factor behind the majority's choice to resolve the ambiguity in favor of more coverage. In the context of the rest of Representative Kennedy's remarks, however, this statement cannot possibly be used, even as a tie-breaker, to decide the issue here. Representative Kennedy went on, after the quoted language, to give the means by which participation was to be increased — i.e., by requiring mortgage lenders to enforce flood insurance purchase requirements. *Id.* At no point in Representative Kennedy's remarks did he allude to the provision at issue here in any way, let alone as a mechanism by which to increase participation in the program. Not only did Representative Kennedy fail to mention the provision at issue here, but *neither did anyone else* during the course of the entire legislative debate. Indeed,

no one even mentioned *business* flood insurance as a discrete matter. When it is added that the legislation "was rushed to the floor after an agreement was reached only last week," *id.* H2967 (statement of Rep. Shaw), it is unlikely that "more than a handful of Members [had] reviewed or even seen the legislation that [was before them] for a vote." *Id.* The idea that Representative Kennedy's statement reflects the intent of Congress can only be laughable. Finally, making the majority's reliance truly incomprehensible, the remark was made to a chamber in which the chair "counted two Members standing [and] less than 10 Members on the floor." *Id.* at H2967.

The majority also reads the 1994 amendment as part of an "ongoing effort to increase the number of people covered by flood insurance," pointing to increases in coverage limits that were enacted in 1973 and 1977. A series of routine increases in the amount of coverage, however, hardly reveals an intent to increase the number of people covered. To the contrary, one should use this history to construe the 1994 amendment as simply a continuation of earlier increases. Yet the majority reads the third increase in 1994 as a "sign" of Congress' intent to expand now the number of persons covered, even though Congress did nothing to indicate such intent.

The majority is forced to rely on such meager and misleading scraps of legislative history because the more reliable forms of legislative history provide it no help. The committee report relating to the provision stated only that it "[i]ncreases coverage for nonresidential structures to $500,000. Increases content coverage for nonresidential structures to $500,000." H.R. Rep. No. 103-414, § 602 (1994). The fact that the House Report did not even devote a complete sentence to the provision at issue here shows the danger of relying on legislative history to decide this case. Most importantly, the most authoritative source of legislative history, the House Report, shows *no intention that the provision of flood insurance be changed from a per-structure basis to a per-insured basis*, only an intention to increase the limits. Thus, to the extent that the legislative history is notable at all, it is notable for its complete silence as to what was, under the majority's reading, a major change in the federal flood insurance program.

*Sixth*, the majority cites a canon of interpretation that ambiguous provisions of insurance policies should be construed in favor of the

insured. Of course, this canon of contract construction does not apply by its own terms to the interpretation of a statute. But more importantly, applying the canon here resolves the ambiguity against the Treasury of the United States without a congressional appropriation. This is in direct violation of both statutory command and constitutional principle. *See* 31 U.S.C. § 1301 ("A law may be construed to make an appropriation out of the Treasury or to authorize making a contract for the payment of money in excess of an appropriation only if the law specifically states that an appropriation is made or that such a contract may be made"); U.S. Const., Art. 1, § 8 ("No money shall be drawn from the treasury, but in consequence of appropriations made by law"). The purportedly ambiguous statute must be construed narrowly so as to not to encroach on Congress's power of the purse.

The majority's unfortunate expansion of the National Flood Insurance Program opens the door to disastrous fiscal consequences.[3] Under the majority's reading, the aggregate amount of coverage available to businesses becomes effectively uncapped. Each insured can obtain up to $1 million in total flood insurance. Thus, where a shopping mall with 100 tenants is flooded and destroyed by an ocean surge, the government will have a potential liability of $100 million for just that mall. Multiplied across the country, the majority's decision might extend the government's obligations by many billions of dollars. We should hesitate to adopt an expansive reading with these consequences, particularly when the expansion is justified solely by the program's generally articulated purpose.

I would reverse the judgment of the district court.

---

[3]The majority claims that its interpretation will result in the issuance of more flood insurance policies with higher limits and that this would somehow help "build the reserves to pay all claims every year." The majority recognizes that each policy issued under the program is a money-losing policy that the government subsidizes every year, but apparently it believes in the motto, "We lose money on every sale, but we make up for it on volume."